OPINION
{¶ 1} Defendant-appellant Rita Kapp appeals from a divorce decree. Mrs. Kapp first contends that the trial court abused its discretion in using the June 30, 2002 valuation date presented by the appraiser of plaintiff-appellee Sherman Kapp to value Kapp Construction, Inc. (hereinafter KCI), because it is more equitable to use the June 30, 2001 valuation date presented by her appraiser. We conclude that the trial court did not abuse its discretion in using the June 30, 2002 valuation date, given the facts and circumstances of this case.
 {¶ 2} Mrs. Kapp contends that the trial court abused its discretion in applying a marketability discount, including a 7.5% discount for transaction costs and a specified additional discount representing a contingency for litigation. We conclude that the trial court abused its discretion in applying a 7.5% discount for transaction costs, because there is no indication that Mr. Kapp plans to sell KCI in the foreseeable future. We conclude that the trial court did not abuse its discretion in applying the litigation contingency discount, because the expert opinion of Mrs. Kapp's appraiser and a letter written by KCI's counsel provide a sufficient basis for this discount.
 {¶ 3} Mrs. Kapp contends that the trial court abused its discretion in assigning a negative value to the Parker Sweeper Building and Lima Heat Treat, Inc., because the value of an asset cannot be reduced below zero by a debt. We conclude that the trial court did not abuse its discretion in assigning a negative value to the Parker Sweeper Building and Lima Heat Treat, Inc., because the lien on the Parker Sweeper Building and the mortgage on the Lima Heat Treat, Inc., are marital debts being assigned to Mr. Kapp along with the property. Mrs. Kapp also contends that the trial court abused its discretion in deducting a second payment of $19,750 from the negative equity award of Lima Heat Treat, Inc., to Mr. Kapp because it is speculative. We conclude that the trial court abused its discretion in deducting the second payment of $19,750, because there is no evidence in the record supporting a second payment of $19,750.
 {¶ 4} Mrs. Kapp contends that the trial court abused its discretion in accepting Mr. Kapp's appraisals of the Derrfield Lots, the Tower Building, and the Wescott Building on the basis that the appraisals were performed one year after the appraisals performed by Mrs. Kapp's appraiser. For each of these properties, we find that the trial court did not base its decision solely on the timing of the appraisal; the decision mentions several other considerations the trial court took in adopting Mr. Kapp's appraisal rather than Mrs. Kapp's appraisal. Although the trial court does note that Mrs. Kapp's appraisals were made one year prior to Mr. Kapp's appraisals, we do not find this consideration to be an abuse of discretion, for the same reason we rejected this argument in Mrs. Kapp's first assignment of error in that her appraisals were conducted at a different economic time than one year later, when Mr. Kapp's appraisals were conducted. We conclude that the trial court did not abuse its discretion in accepting Mr. Kapp's appraisals of the Derrfield Lots, the Tower Building, and the Wescott Building.
 {¶ 5} Recognizing that this argument is in conflict with her second assignment of error, Mrs. Kapp defensively contends that the trial court abused its discretion in not giving a discount for transaction costs on the Briarwood properties that were awarded to her. We overrule Mrs. Kapp's fifth assignment of error for the same reasons we sustain the portion of her second assignment of error relating to the discount for transaction costs.
 {¶ 6} Mrs. Kapp contends that the trial court abused its discretion in failing to divide a $126,500 payable owed by KCI to Mr. Kapp for a loan he made to KCI to purchase a crane. We conclude that the trial court did not abuse its discretion, because Mr. Kapp's loan to purchase the crane is listed as an asset of KCI, which is one of the marital assets that was divided between the parties.
 {¶ 7} Mrs. Kapp contends that the trial court abused its discretion in awarding her 100,000 shares of stock in the National Fruit and Vegetable Company, at a value of $50,000, because the stock has no value. We conclude that the 100,000 shares of stock in the National Fruit and Vegetable Company should either be awarded to Mr. Kapp or they should be determined to have no value, because the company has not yet opened and there is no evidence in the record showing the actual value of the stock. In addition, Mr. Kapp admits to having regretted investing in the stock.
 {¶ 8} Mrs. Kapp contends that the trial court abused its discretion in not awarding her spousal support, because the trial court underestimated Mr. Kapp's anticipated annual income. Mrs. Kapp argues that Mr. Kapp's annual income is much more than $125,502, because he has approximately $488,353 in discretionary cash flow from KCI available to him each year. We conclude that the discretionary cash flow available to Mr. Kapp would not increase his anticipated annual income because it is not income to him; when he borrows the money, he has to pay the money back to KCI. We conclude that the trial court did not abuse its discretion in not awarding spousal support to Mrs. Kapp on this basis.
 {¶ 9} Accordingly, the judgment of the trial court is Affirmed, in part, and Reversed, in part, and this cause is Remanded for further proceedings consistent with this opinion.
 I {¶ 10} Sherman and Rita Kapp were married in July, 1972, and had two children together. In April, 2000, Mr. Kapp filed a complaint for divorce. At that time, only one of their children, Tyler, was a minor. On the first day of the final evidentiary hearing in this matter, both parties agreed to designate Mr. Kapp as the residential parent and legal custodian of Tyler. Mr. Kapp did not seek child support.
 {¶ 11} After an eleven day hearing, the trial court rendered an eighty-page judgment entry and decree of divorce making the following findings pertinent to this appeal:
 {¶ 12} The trial court awarded Mr. Kapp all rights, title, and interest in Kapp Construction, Inc., the company he founded in 1985. The trial court found the adjusted net fair market value of KCI to be $1,444,408.50, including a marketability discount for transaction costs and contingencies for litigation.
 {¶ 13} The trial court awarded the Parker Sweeper Building to Mr. Kapp. The trial court found the fair market value of the Parker Sweeper Building to be $89,000 and subject to a lien to KCI in the amount of $140,000, leaving a net negative equity of $51,000. The trial court also awarded Mr. Kapp the fifty percent interest the Kapps had in Lima Heat Treat, Inc. The trial court found the fair market value of Lima Heat Treat, Inc., to be $1,170,000, subject to a mortgage balance of $1,335,000, amounting to a net negative equity of $165,000. Based on the Kapps' fifty percent interest in Lima Heat Treat, Inc., the trial court determined that a negative equity of $82,500 remained, plus two payments of $19,750, owed by the Kapps to the business, leaving a total negative equity of $122,000.
 {¶ 14} The trial court awarded the Derrfield Lots, Tower Building, and Wescott Building to Mr. Kapp. Based on the appraisal conducted by Mr. Kapp's appraiser, the trial court found the fair market value and net equitable value of the Derrfield Lots to be $154,000, one-half of which is the value of the marital property. Based on the appraisal conducted by Mr. Kapp's appraiser, the trial court found the fair market value of Tower Building to be $330,000, with outstanding liens of $247,170, leaving a total net equity of $82,830, one-half of which is the marital property. Based on the appraisal conducted by Mr. Kapp's appraiser, the trial court found the fair market value of the Wescott Building to be $375,000, subject to an indebtedness to KCI in the amount of $277,814, leaving a total net equity of $97,186.
 {¶ 15} The trial court awarded the properties of 4011 and 4013 Briarwood in Urbana to Mrs. Kapp. The trial court found the fair market value of 4011 Briarwood to be $750,000, and the fair market value of 4013 Briarwood to be $155,000. The trial court also awarded Mrs. Kapp 100,000 shares of National Fruit and Vegetable Company stock, and assigned those shares an approximate value of $50,000. The trial court ordered that no spousal support was to be paid, and did not retain jurisdiction concerning the issue of spousal support.
 {¶ 16} From the judgment entry and decree of divorce, Mrs. Kapp appeals.
 {¶ 17} Both parties have filed their briefs under seal, and Mr. Kapp, in response to our order to show cause why this opinion should not be filed in the normal course, has argued that the need to keep certain financial information confidential justifies filing this opinion under seal. The judgment and decree of divorce is under seal. Other than in cases governed by App.R. 11.2(B), dealing with appeals from orders denying requests to authorize abortion without the minor's consent, we have never filed an opinion of this court under seal, and we question our need, or even our authority, to do so in this case. Nevertheless, we agree with Mr. Kapp that disclosure of the amount of the discount in the value of his business attributable to the contingent litigation liability that he argues is appropriate, and that the trial court agreed was appropriate, is sensitive information that could compromise negotiation of a settlement of that liability. For this reason, we have not specified the amount of that discount in this opinion.
 II {¶ 18} Mrs. Kapp's first assignment of error is as follows:
 {¶ 19} "THE TRIAL COURT ABUSED ITS DISCRETION BY USING A VALUATION DATE LATER THAN JUNE 30, 2001[.]"
 {¶ 20} Mrs. Kapp contends that the trial court abused its discretion in using the June 30, 2002 valuation date presented by Mr. Kapp's appraiser to value KCI. She contends that it is more equitable to use the June 30, 2001 valuation date presented by her appraiser, because Mr. Kapp has been in complete control of the assets and liabilities of KCI and the equities demand that the valuation date be as close as possible to the de facto end of their marriage in April, 2000.
 {¶ 21} A trial court has broad discretion in determining an equitable property division in divorce cases. Berish v. Berish
(1982), 69 Ohio St.2d 318, 319, 23 O.O.3d 296, 432 N.E.2d 183. "`* * * Marriage is a union of equals. Neither party should make a profit at the expense of the other. * * * This is why it is ill-advised and impossible for any court to set down a flat rule concerning property division upon divorce. A trial court must have discretion to do what is equitable upon the facts and circumstances of each case.'" Id. at 320, citing Cherry v.Cherry (1981), 66 Ohio St.2d 348, 355, 20 O.O.3d 318,421 N.E.2d 1293. However, if the trial court abuses that discretion, a reviewing court may modify or reverse the property division. Id. at 319. A trial court abuses its discretion when it makes a decision that is unreasonable, arbitrary, or unconscionable.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140. For purposes of dividing the marital property, the trial court may use the date of the marriage or the date of the final hearing. R.C. 3105.171(A)(2)(a). If the trial court determines that the use of either of these dates would be inequitable, the trial court may select a more equitable date. R.C. 3105.171(A)(2)(b).
 {¶ 22} "Equity may occasionally require valuation as of the date of the de facto termination of the marriage. The circumstances of a particular case may make a date prior to trial more equitable for the recognition, determination and valuation of relative equities in marital assets." Berish, supra, at 320. "In order to do equity, a trial court must be permitted to utilize alternative valuation dates, such as the time of permanent separation or de facto termination of the marriage, where reasonable under the facts and circumstances presented in a particular case. In this fashion, the trial court will have the necessary flexibility to exercise its discretion in making truly equitable awards consistent with legitimate expectations of the parties." Id. at 321.
 {¶ 23} The trial court found that the circumstances of this case made June 30, 2002 a more equitable valuation date and determined that the adjusted net fair market value of KCI was $1,444,408.50. The trial court found that "[b]y applying the lack of marketability discounts and comparing the appraiser's up-dated reports, through June 30, 2002, it appears that Mr. Kapp's appraiser appraises the net fair market value of the company to be $1,797,000.00 per his testimony at the hearing herein and it further appears that Ms. Kapp's expert suggests an up-dated net fair market value of $1,802,115.00, thereby leaving a difference in the valuations at $5,115.00." The trial court then added half of the difference, $2,557.50, to $1,802,115.00, and found the adjusted net fair market value of KCI to be $1,804,672.50. After awarding $360,364 in Park National Bank stock held by KCI to Mrs. Kapp, the trial court reduced the net fair market value of KCI to $1,444,408.50.
 {¶ 24} We find the trial court's use of the June 30, 2002 valuation date to be reasonable given the facts and circumstances of this case. On May 30, 2002, Mrs. Kapp's appraiser, Anthony Mollica, completed a business valuation of KCI, with an effective date of June 30, 2001, finding the fair market value of KCI to be $2,414,605. Mollica testified that he used June 30, 2001, as the valuation date because that was the last date in which he had completed year-end financial statements. Mollica testified that completed year-end financial statements for June 30, 2002, were not available to him at the time he completed and issued his report. Mollica also testified that he was not given authority to use any other date as a valuation date.
 {¶ 25} In July, 2002, Mr. Kapp's appraiser, David Sanders, issued a business valuation of KCI with an effective date of June 30, 2002 finding the fair market value of KCI to be $1,710,500. Sanders' valuation was based on third-quarter financial statements and a projection of results anticipated for the fiscal year-end of June 30, 2002. In September, 2002, Sanders updated his valuation after reviewing the 2002 year-end financial statements and found the fair market value of KCI to be $1,797,000. Sanders testified that the decline in value of KCI from 2001 was attributed to a fifty percent decline in sales, which was consistent with the construction industry in that region. Sanders also testified that the decline was attributed to the effects of the terrorist attacks on September 11, 2001, and an economic recession.
 {¶ 26} Sanders testified that although he concurred substantially with Mollica's June 30, 2001 report and agreed that June 30, 2001, was a convenient date because it represented the fiscal year-end, he believed that Mollica's report did not extend the financial analysis through the most relevant fiscal year-end. Sanders testified that using the June 30, 2001 valuation date did not reflect the significant downturn in business that KCI suffered in the following year. Sanders testified that using a date other than June 30, 2002, could result in enhancing the value of KCI beyond what it was realistically worth and could result in an unjust split of the assets.
 {¶ 27} Mrs . Kapp contends that Mr. Kapp has been in complete control of the assets and liabilities of KCI and, therefore, the equities demand that the valuation date be as close as possible to the de facto end of their marriage in April, 2000. Mrs. Kapp argues that this is particularly applicable when the assets decline in value due to the possibility of deliberate dissipation of assets. In support of her contention, Mrs. Kapp points to the following testimony by Mr. Kapp:
 {¶ 28} "Q. Okay. You would attribute some of the downturn in your business to the fact that you just aren't working as hard and as efficiently as you have in the past, wouldn't you?
 {¶ 29} "A. Yes, sir, I would. I don't know that, how long this can continue on but, yeah, I prided myself — there were times that I felt like I could do the work of two people and bringing in work and getting it done. And frankly, last couple years my heart hasn't been in it like it had been in the past.
 {¶ 30} "Q. And you attributed that lack of energy and keenness to the pressures of going through this divorce?
 {¶ 31} "A. Yes, sir."
 {¶ 32} We do not find that Mr. Kapp's testimony amounts to a showing of a deliberate dissipation in assets causing a decline in KCI's value. We find that the evidence in the record shows that KCI's decline in value was due to the effects of the terrorist attacks on September 11, 2001, and an economic recession and was consistent with the construction industry in the region. Mollica also admitted that the terrorist attacks on September 11, 2001, were still having a rippling effect on the regional and national economy. Mollica's June 30, 2001 valuation date did not reflect the significant downturn in business that KCI suffered in the following year. We conclude that the trial court did not abuse its discretion in using the June 30, 2002 valuation date, given the facts and circumstances of this case.
 {¶ 33} Mrs. Kapp also contends that the trial court abused its discretion in relying on the fair market value of KCI after a marketability discount in Mollica's updated report. The trial court noted that Mollica's June 30, 2001 appraisal did not take into account the operating loss of KCI for the preceding year, since that information was not made available to Mollica until after his report was completed. The trial court then relied on a report updated by Mollica in September, 2002, after receiving the 2002 year-end financial statements. In the updated report, Mollica found the fair market value of KCI before a marketability discount to be $2,059,560. Although Mollica testified that he did not find a marketability discount to be appropriate in this case, he did provide in his updated report a fair market value of KCI in the amount of $1,802,115, after a marketability discount. Because the trial court found the lack of a marketability discount to be appropriate, it relied on Mollica's $1,802,115 fair market value after a marketability discount in determining the fair market value of KCI.
 {¶ 34} Because we conclude that the marketability discount for transaction costs is not appropriate in this case, based on our analysis in Section III, infra, we conclude that the trial court did abuse its discretion in using Mollica's $1,802,115 fair market value after a marketability discount, when calculating the fair market value of KCI.
 {¶ 35} Mrs. Kapp's first assignment of error is sustained as to the trial court's use of Mollica's $1,802,115 fair market value after a marketability discount, but is overruled in all other respects.
 III {¶ 36} Mrs. Kapp's second assignment of error is as follows:
 {¶ 37} "THE TRIAL COURT ABUSED ITS DISCRETION BY ADOPTING HUSBAND'S EXPERT'S VALUATION METHODOLOGY IN HIS APPRAISAL OF KCI THAT INCLUDED MARKETABILITY DISCOUNTS FOR TRANSACTION COSTS AND LITIGATION EXPOSURE[.]"
 {¶ 38} Mrs. Kapp contends that the trial court abused its discretion in applying a marketability discount, including a 7.5% discount for transaction costs and a specified discount representing contingency for litigation. Mrs. Kapp contends that the 7.5% discount for transaction costs is inappropriate because Mr. Kapp has no present plans to sell KCI.
 {¶ 39} Sanders testified that he found a marketability discount to be appropriate because "a seller would incur those costs and would give that fair consideration in the valuing of that company." Sanders testified that he found a 7.5% discount for transaction costs to be appropriate, which he broke down into 5% for broker fees, 1.25% for legal fees, and 1.25% for accounting fees. He testified that he would include the 5% in broker fees because few people are able to sell the business on their own.
 {¶ 40} Mollica testified that a marketability discount is inappropriate, and that a discount for transaction costs would be taken only if the business were to be sold. Mollica testified that the only time he has taken a discount for transaction costs is if he has been directed by a court or someone with legal standing to sell the business.
 {¶ 41} In Baker v. Baker (1992), 83 Ohio App.3d 700, 705,615 N.E.2d 699, the Ninth District Court of Appeals held that a trial court did not abuse its discretion in failing to consider selling costs in valuing rental properties where there was no indication that the appellant was going to sell the properties in the foreseeable future. We agree with this premise. Mollica and Sanders both testified that there was no indication that KCI was going to be sold. We conclude that the trial court abused its discretion in applying a 7.5% discount for transaction costs where there is no indication that Mr. Kapp is planning on selling KCI in the foreseeable future.
 {¶ 42} Mrs. Kapp also contends that the discount representing a contingent litigation liability is inappropriate because this liability is speculative and could be spread to other defendants in the case or covered by KCI's insurance.
 {¶ 43} Mr. Kapp testified that there is a pending wrongful death lawsuit against KCI arising out of a death that occurred on a construction project. He testified that although KCI has insurance, the insurance company has informed him that KCI may not be covered because the lawsuit involved a death caused by pollution and KCI does not have pollution insurance. Mr. Kapp also testified that KCI is facing potential exposure for an OSHA violation for allowing an electrician to use a KCI man lift without the proper harnessing at the site of one of their construction projects. Mr. Kapp testified that since it was a KCI project and KCI equipment was being used, KCI could ultimately be responsible. He testified that KCI may face a potential OSHA fine substantially greater than that of the electrical subcontractor, who does not have "deep pockets."
 {¶ 44} Mollica testified that he did not take a litigation contingency discount because it was not his job to make an assessment of the merits of the potential loss from the pending lawsuit and OSHA violation. Sanders testified that the specified contingency for litigation was appropriate, and even conservative in this situation. Sanders testified that under the definition of fair market value,[1] a willing buyer would take into consideration a potential contingent liability like a wrongful death claim that may be uninsured. In determining the amount of the litigation contingency discount, Sanders relied on a letter from KCI counsel on this matter that included the following statement:
 {¶ 45} "If the court determines that you have no insurance coverage for the plaintiff's claim in this case, Kapp Construction will bear the primary responsibility for any eventual award (or negotiated settlement) which will eventually be required to be paid to the plaintiff. While we cannot definitively estimate the dollar amount of such a claim, you need to be alerted to the fact that recent jury awards in Clark County have become considerably more generous toward plaintiffs in these types of cases, and an award in excess of * * * is not beyond the realm of possibility."
 {¶ 46} We find that there is a sufficient basis for Sander's assessment of the specified contingency for litigation based on his expert opinion and the letter written by KCI counsel. We conclude that the trial court did not abuse its discretion in applying the specified litigation contingency discount.
 {¶ 47} Mrs. Kapp's second assignment of error is sustained as to the 7.5% discount for transaction costs, and overruled as to the specified contingency for litigation.
 IV {¶ 48} Mrs. Kapp's third assignment of error is as follows:
 {¶ 49} "THE TRIAL COURT ABUSED ITS DISCRETION IN ASSIGNING A NEGATIVE VALUE TO TWO PARCELS OF REAL ESTATE."
 {¶ 50} Mrs. Kapp contends that the trial court abused its discretion in assigning a negative value to the Parker Sweeper Building and to Lima Heat Treat, Inc., and requiring her to forfeit $173,000 awarded to her to equalize the negative value assets awarded to Mr. Kapp. Mrs. Kapp argues that an asset cannot be given a negative fair market value, reducing the total value of the marital estate, and cannot be reduced beyond a value of zero by a debt.
 {¶ 51} Parker Sweeper Building was appraised at a fair market value of approximately $68,000 by Mr. Kapp's appraiser and a fair market value of $110,000 by Mrs. Kapp's appraiser. The trial court divided the difference between the two appraisals and found the fair market value of the Parker Sweeper Building to be $89,000. The trial court also found that the Parker Sweeper Building was subject to a lien to KCI in the amount of $140,000, leaving a net negative equity of $51,000.
 {¶ 52} Lima Heat Treat, Inc., evidently a parcel of real estate despite its name, was appraised at a fair market value of $1,355,000 by Mrs. Kapp's appraiser and a fair market value of $1,170,000 by Mr. Kapp's appraiser. The trial court found that in appraising Lima Heat Treat, Inc., Mrs. Kapp's appraiser "utilized comparable estimates which were not compiled by himself or his company and which were situated in Toledo, Ohio, more than an hour from the Lima, Ohio market where this facility is located." The trial court also found that Mrs. Kapp's appraiser "failed to take into account that the ceilings in this facility ranged between 12 and 14 feet, which is low for a commercial storage facility and he also did not take into account anticipated costs of converting a heat treating business to a commercial storage facility, which he maintains to be the best use for the facility." In addition, the trial court found that Mrs. Kapp's appraiser "did not take into account the fact that Mr. and Mrs. Kapp only own a fractional interest in the subject premises, all of which makes its sale to a third party much less marketable than Ms. Kapp's appraiser anticipates."
 {¶ 53} Therefore, the trial court found the fair market value of Lima Heat Treat, Inc., to be $1,170,000 and subject to a mortgage balance of $1,335,000, amounting to a net negative equity of $165,000. Based on the Kapps' fifty percent interest in Lima Heat Treat, Inc., the trial court determined that a negative equity of $82,500 remained plus two payments of $19,750, owed by the Kapps to the business, leaving a total negative equity of $122,000. Regarding the two payments of $19,750, the trial court found that the Kapps owed one payment of $19,750 as their share of cash infusion to keep the company's obligations current and that another payment of $19,750 "may be again due by the Kapps in the near future."
 {¶ 54} The trial court awarded the Parker Sweeper Building and Lima Heat Treat, Inc., to Mr. Kapp and ordered that he pay, and save Mrs. Kapp harmless from, the outstanding $1,335,000 mortgage on Lima Heat Treat, Inc., the two payments of $19,750, and the $140,000 lien to KCI on the Parker Sweeper Building.
 {¶ 55} We conclude that the trial court did not abuse its discretion in assigning a negative value to the Parker Sweeper Building and Lima Heat Treat, Inc. It is undisputed that the $140,000 lien on the Parker Sweeper Building and the $1,335,000 mortgage on the Lima Heat Treat, Inc., are marital debts and that these debts are being assigned to Mr. Kapp along with the property. We cannot conclude that the trial court's decision is unreasonable, arbitrary, or unconscionable in this regard.
 {¶ 56} Mrs. Kapp also contends that the second payment of $19,750 should be deducted from the negative equity award to Mr. Kapp because it is speculative.
 {¶ 57} We find that there is no evidence in the record to support a second payment of $19,750. Mr. Kapp testified that he and his partner in Lima Heat Treat, Inc., each put in $12,000 to catch up on mortgage payments, but that his partner put in an additional $19,000, so that Mr. Kapp currently owes another $19,000. Mr. Kapp then clarified that he owed $19,750. There is no testimony regarding a second payment of $19,750. We find that the trial court abused its discretion in deducting the second payment of $19,750.
 {¶ 58} Accordingly, Mrs. Kapp's third assignment of error is sustained only to the extent of the deduction of the second payment of $19,750, and overruled in all other respects.
 V {¶ 59} Mrs. Kapp's fourth assignment of error is as follows:
 {¶ 60} "THE TRIAL COURT ABUSED ITS DISCRETION AND ERRED AS A MATTER OF LAW IN ACCEPTING HUSBAND'S APPRAISALS OF VARIOUS PARCELS OF REAL ESTATE, WHICH WERE PERFORMED ONE YEAR AFTER WIFE'S APPRAISALS AND ONE YEAR FURTHER AWAY FROM THE DE FACTO
END OF THE PARTIES' MARRIAGE[.]"
 {¶ 61} Mrs. Kapp contends that the trial court abused its discretion in accepting Mr. Kapp's appraisals of the Derrfield Lots, the Tower Building, and the Wescott Building on the basis that the appraisals were performed one year after the appraisals performed by Mrs. Kapp's appraiser, because this was one year further away from the de facto end of their marriage. Mrs. Kapp incorporates her arguments from her first assignment of error.
 {¶ 62} Based on the appraisal conducted by Mr. Kapp's appraiser, the trial court found the fair market value of the Derrfield Lots to be $154,000, one-half of which is the value of the marital property. Specifically, the trial court stated as follows:
 {¶ 63} "Mr. Kapp's appraiser appraised this property in February, 2002 and determined a fair market value of $154,000.00. Ms. Kapp's appraiser appraised this property in March, 2001, approximately one year earlier and he contends that it has a fair market value of $245,000.00. Ms. Kapp's appraiser contends that the highest and best use for the undeveloped lot is commercial in nature, however, this property is zoned R-4 which means that it can only be used for multi-family use unless a variance has been obtained to build a commercial building. Likewise, Ms. Kapp's appraiser did not take into account that the parties herein only own a fractional interest of the subject real estate, all of which serves to discount the marketability of the property if it were to be sold."
 {¶ 64} Based on the appraisal conducted by Mr. Kapp's appraiser, the trial court found the fair market value of the Tower Building to be $330,000, with outstanding liens of $247,170, leaving a total net equity of $82,830, one-half of which is the marital property. The trial court stated as follows:
 {¶ 65} "Mr. Kapp's appraiser conducted his appraisal in February, 2002 and he contends that the fair market value of the subject premises is $330.000.00. Ms. Kapp's appraiser, on the other hand, conducted his appraisal in March, 2001, approximately one year earlier, and concluded that the fair market value of the subject premises is $465,000.00. This Court notes that Ms. Kapp's appraiser was never actually in the building itself; none of his comparables that he used to formulate his appraisal has basements (as this building does) and all were single story units (which this is not). Likewise, he was not aware that this building is not ADA compliant in that it is not handicap accessible and it has no elevator. It should also be noted that this facility has an uneven parking lot with a small number of spaces and it is situated on a one-way street which makes it awkward to get to. Again, he was also not aware of the fact that the parties herein actually own a factional interest in the subject premises, all of which serve to discount the marketability of the subject premises."
 {¶ 66} Based on the appraisal conducted by Mr. Kapp's appraiser, the trial court found the fair market value of the Wescott Building to be $375,000 subject to an indebtedness of $277,814, leaving a total net equity of $97,186. The trial court stated as follows:
 {¶ 67} "Mr. Kapp's appraiser appraised the value of this property in February, 2002 and estimated its fair market value to be $375,000.00. On the other hand, Ms. Kapp's appraiser conducted his appraisal in March, 2001, approximately one year earlier, and estimated its fair market value to be $655,000.00. The Court notes, however, that Ms. Kapp's appraiser did not use comparable property (as he did on the other properties) to arrive at his opinion concerning the value of this property and the Court also notes that his appraisal was conducted approximately one year prior to the appraisal conducted by Mr. Kapp's appraiser, in times in which the economy differed from the most recent appraisal or even the time which has passed thereafter."
 {¶ 68} For each of these properties, we conclude that the trial court did not base its decision solely on the timing of the appraisal; the trial court's decision mentions several other factors the trial court took into consideration in adopting Mr. Kapp's appraisal, rather than Mrs. Kapp's appraisal. Although the trial court does note that Mrs. Kapp's appraisals were made one year prior to Mr. Kapp's appraisals, we do not find this consideration to be an abuse of discretion, for the same reason we rejected this argument in Mrs. Kapp's first assignment of error. We conclude that the trial court did not abuse its discretion in accepting Mr. Kapp's appraisals of the Derrfield Lots, the Tower Building, and the Wescott Building.
 {¶ 69} Mrs. Kapp's fourth assignment of error is overruled.
 VI {¶ 70} Mrs. Kapp's fifth assignment of error is as follows:
 {¶ 71} "THE TRIAL COURT ABUSED ITS DISCRETION BY NOT DISCOUNTING THE VALUE OF THE BRIARWOOD PROPERTIES BY THEORETICAL RELATOR COMMISSION AND CAPITAL GAIN TAXES[.]"
 {¶ 72} Mrs. Kapp contends that the trial court abused its discretion in not giving a discount for transaction costs on the Briarwood properties, as was done in the KCI valuation. Mrs. Kapp recognizes that this assignment of error is in logical conflict with her second assignment of error and requests that we disregard this assignment of error if we accept her argument in her second assignment of error. In other words, this is a "what's sauce for the goose should be sauce for the gander" argument in which Mrs. Kapp argues that if, despite her arguments to the contrary, we should approve Mr. Kapp's marketability discount for the property awarded to him, then she should enjoy a marketability discount for the property awarded to her.
 {¶ 73} Because we are sustaining Mrs. Kapp's second assignment of error in this regard, concluding that the trial court abused its discretion in applying a 7.5% discount for transaction costs where there was no indication that Mr. Kapp had an intent to sell KCI in the foreseeable future, we consistently overrule Mrs. Kapp's fifth assignment of error for the same reasons.
 {¶ 74} Mrs. Kapp's fifth assignment of error is overruled.
 VII {¶ 75} Mrs. Kapp's sixth assignment of error is as follows:
 {¶ 76} "THE TRIAL COURT ABUSED ITS DISCRETION BY NOT DIVIDING BETWEEN THE PARTIES A $126,500 INDEBTEDNESS OWED TO MR. KAPP BY KCI[.]"
 {¶ 77} Mrs. Kapp contends that the trial court abused its discretion in failing to divide an account payable owed by KCI to Mr. Kapp in the amount of $126,500.
 {¶ 78} Mr. Kapp testified that in November, 1999, he withdrew $100,000 from the parties' joint bank account, then added $26,500 to that amount, and loaned KCI $126,500 to purchase a crane. Although Mr. Kapp testified that the $126,500 is shown as a corporate payable, KCI's 1996-2000 financial statements do not provide a record of the loan. Rather, the crane is recorded as a KCI asset.
 {¶ 79} In conducting his business valuation of KCI, Mollica, Mrs. Kapp's appraiser, relied on an appraisal report on KCI equipment by the Vannatta Brothers, which lists the crane as an asset. The Vannatta Brothers appraisal report was included in Mollica's business valuation and provided the basis of the asset valuation for Mollica's appraisal of KCI. Specifically, Mollica adopted the Vannatta Brothers estimated fair market value of the company's furniture, fixtures and equipment at $725,000, including the crane, in his business valuation.
 {¶ 80} We conclude that the trial court did not abuse its discretion. The crane purchased with the money Mr. Kapp loaned KCI is listed as an asset of KCI, unencumbered by debt, which is one of the marital assets that was divided between the parties. Mrs. Kapp has received her half of the award of KCI to Mr. Kapp with a corresponding, equal award of other property. It is equitable, then, not to award Mrs. Kapp, also, a share of the loan proceeds used to finance the crane, since to do so would effectively award her the same asset twice.
 {¶ 81} Mrs. Kapp's sixth assignment of error is overruled.
 VIII {¶ 82} Mrs. Kapp's seventh assignment of error is as follows:
 {¶ 83} "THE TRIAL COURT ABUSED ITS DISCRETION IN AWARDING TO WIFE 100,000 SHARES OF NATIONAL FRUIT AND VEGETABLE COMPANY[.]"
 {¶ 84} Mrs. Kapp contends that the trial court abused its discretion in awarding her 100,000 shares of stock in the National Fruit and Vegetable Company at a value of $50,000, because the stock has no value.
 {¶ 85} Mr. Kapp testified that he purchased 100,000 shares of stock in the National Fruit and Vegetable Company for $50,000. He testified that he keeps saying that "they are going to open and it never happens, so, you put it in the back of your mind and forget about it." Mr. Kapp testified that he has no way of tracking the value of the stock. He also testified that a friend had advised him that purchasing the stock was not a good idea, and that he wished he had listened to his friend. There is no evidence in the record showing the actual value of the stock.
 {¶ 86} We conclude that the 100,000 shares of stock in the National Fruit and Vegetable Company should either be awarded to Mr. Kapp or they should be determined to have no value, because the company has not yet opened and there is no evidence in the record showing the actual value of the stock. In addition, Mr. Kapp admits regretting having invested in the stock.
 {¶ 87} Mrs. Kapp's seventh assignment of error is sustained.
 IX {¶ 88} Mrs. Kapp's eighth assignment of error is as follows:
 {¶ 89} "THE TRIAL COURT ABUSED ITS DISCRETION BY NOT AWARDING SPOUSAL SUPPORT TO WIFE[.]"
 {¶ 90} Mrs. Kapp contends that the trial court abused its discretion in not awarding her spousal support, because the trial court underestimated Mr. Kapp's anticipated annual income. She contends that Mr. Kapp has $533,855 at his disposal each year, rather than the $125,502 in annual income, as determined by the trial court. She argues that his annual income is much more than $125,502, because he has approximately $488,353 in discretionary cash flow from KCI available to him each year. Because the trial court determined Mrs. Kapp's annual earning capacity to be $102,132.08, she contends that the trial court should have awarded her spousal support based on the disparity of annual income between the parties.
 {¶ 91} The trial court found that Mr. Kapp has an anticipated annual income of $125,502, including an $80,000 salary from KCI and $45,502 in rental income from the Spacemaker investment. The trial court found that Mrs. Kapp is unemployed, but has an annual earning capacity of $22,132.08. The trial court also found that Mrs. Kapp has the ability to receive $11,000 in rental income from 4013 Briarwood; $4,000 in rental income from the 60 acres of farm land at the Briarwood property; $15,000 in dividends from the stock awarded to her; and $50,000 in rental income from the Ogden Road apartments. Based on these findings, the trial court concluded that Mrs. Kapp has an annual earning capacity of $102,132.08.
 {¶ 92} The trial court then found that "from the totality of the credible evidence, that taking into account the property division set forth hereinbefore; the allocation of debts as set forth hereinbefore; the distribution of pension and retirement benefits as set forth hereinbefore; the equitable goal of spousal support; the needs of the Defendant herein; the mitigation against abrupt changes in lifestyle; the ability of the Plaintiff herein to pay; spousal support is not warranted in this case. Similarly, in consideration of the foregoing, this Court finds that it is not appropriate for this Court to retain jurisdiction concerning this issue."
 {¶ 93} We conclude that the trial court did not abuse its discretion in deciding not to award spousal support to Mrs. Kapp upon the ground that Mr. Kapp has discretionary cash flow at his disposal. Mollica testified that discretionary cash flow is corporate earnings before interest, taxes, depreciation, and amortization. Mollica further testified as follows:
 {¶ 94} "Q. And what do you mean by discretionary cash flow?
 {¶ 95} "A. Discretionary cash flow is the money that is generated by the operation that goes to the owner to use at their discretion. And in this case, the discretion is not an ambiguous term. It can be used to purchase new equipment, buy other investments, anything.
 {¶ 96} "Q. Even to satisfy personal expenses?
 {¶ 97} "A. Sure.
 {¶ 98} "Q. Now, so the discretionary cash flow on a seven-year average has been how much per year?
 {¶ 99} "A. $488,353."
 {¶ 100} On cross-examination, Mollica clarified that discretionary cash flow can be used for business or personal use, but that it belongs to the corporation, and is not discretionary income to Mr. Kapp. Sanders testified that borrowing money does not amount to discretionary income, because it has to be paid back. Sanders testified that Mr. Kapp has historically borrowed and repaid money to the corporation. Sanders testified that when Mr. Kapp borrows money from the corporation, he does not have to pay taxes on it, but does have to repay the money because it is considered a loan, not income.
 {¶ 101} We conclude that the discretionary cash flow available to Mr. Kapp would not increase his anticipated annual income, because it is not income to him. When he borrows the money, he has to pay the money back to KCI. The income KCI can be expected to produce obviously enhances its value, but this value has already been taken into account in the division of property between the parties. Mrs. Kapp has also been awarded income-producing assets. We conclude that the trial court did not abuse its discretion in deciding not to award spousal support to Mrs. Kapp.
 {¶ 102} Mrs. Kapp's eighth assignment of error is overruled.
 X {¶ 103} Mrs. Kapp's first, second, and third assignments of error having been sustained, in part, her seventh assignment of error having been sustained in its entirety, and her fourth, fifth, sixth, and eighth assignments of error having been overruled, those parts of the judgment of the trial court: (1) assigning a marketability discount to the interest in KCI awarded to Mr. Kapp; (2) deducting a second $19,750 debt amount from the value of real property awarded to Mr. Kapp; and (3) awarding Mrs. Kapp 100,000 shares in the National Fruit and Vegetable Company, and assigning those shares a value of $50,000, are Reversed; the judgment of the trial court is Affirmed in all other respects; and this cause is Remanded for further proceedings consistent with this opinion.
Brogan, P.J., and Wolff, J., concur.
[1] Mollica and Sanders both define "fair market value," pursuant to Revenue Ruling 59-60, as "the price at which an enterprise would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of all relevant facts."