[Cite as *Dorsey v. Dorsey*, 2013-Ohio-4237.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

VICKI S. DORSEY                          :

     Plaintiff-Appellee               :           C.A. CASE NO.     25436

v.                                       :           T.C. NO.     09LS23

WILLIAM R. DORSEY, D.O.                  :           (Civil  appeal  from  Common
Pleas

                                                  Court, Domestic Relations)

     Defendant-Appellant              :

                                                       :

. . . . . . . . . .

**O P I N I O N**

Rendered on the     27th     day of     September    , 2013.

. . . . . . . . . .

CHARLES D. LOWE, Atty. Reg. No. 0033209, 8087 Washington Village Drive, Suite 102, Dayton, Ohio 45458
        Attorney for Plaintiff-Appellee

JOHN D. SMITH, Atty. Reg. No. 0018138 and ANDREW P. MEIER, Atty. Reg. No. 0083343, 140 N. Main Street, Suite B, Springboro, Ohio 45066
        Attorneys for Defendant-Appellant

. . . . . . . . . .

FROELICH, J.

    **{¶ 1}**   William R. Dorsey, D.O., appeals from a final judgment and decree of

divorce filed by the Montgomery County Court of Common Pleas, Domestic Relations Division, which awarded a divorce to Dr. Dorsey and his wife, Vicki Dorsey, divided the parties' assets, and addressed other matters.

{¶ 2} For the following reasons, the judgment of the trial court will be affirmed in part, reversed in part, and remanded for further proceedings.

I

{¶ 3} William and Vicki Dorsey were married in 1982. In 2009, Ms. Dorsey filed a complaint for divorce, and Dr. Dorsey filed a counterclaim for divorce. The two children born of the marriage were emancipated prior to the divorce. The parties agreed to treat July 1, 2010 as the date of the "de facto" termination of the marriage for the purpose of dividing their assets. The parties agreed on the manner in which some assets would be divided, and the division of other assets was determined by the trial court. The trial court entered its Final Judgment and Decree of Divorce in 2012.

{¶ 4} The issues of property division that are pertinent to this appeal are as follows: Dr. Dorsey retained his medical practice, but was ordered to pay one-half of its value to Ms. Dorsey. Each party was awarded his or her primary vehicle. However, Ms. Dorsey's car, a Mercedes, was owned by Dr. Dorsey's medical practice. The value of the car was included in the value of the medical practice, which was divided between the parties; Dr. Dorsey received a credit of $27,000 "toward the ultimate property settlement, representing the income tax liability [to his practice] that will result from the transfer of the title to the Mercedes to the wife." The trial court valued the Mercedes at $50,000, which it found to be the fair market value, although the car was on the books of the medical practice

at a value of $73,172.

{¶ 5} The trial court determined that Dr. Dorsey's life insurance policy had a cash surrender value of $728,106 as of the end of the marriage and Ms. Dorsey had a policy with a cash surrender value of $4,946 as of the same date; it ordered that the values of these policies be divided equally.

{¶ 6} The parties had a Fifth Third securities account that was valued at the time of the divorce at $152,365. The trial court found, however, that Dr. Dorsey had previously "inappropriately" withdrawn $100,000 from this account. The court awarded the account to Ms. Dorsey ($152,365) and ordered Dr. Dorsey to pay her an additional $50,000 representing half of the funds he withdrew.

{¶ 7} Finally, the trial court retained jurisdiction over the parties' 2011 federal and state income tax refunds.

{¶ 8} Dr. Dorsey raises two assignments of error on appeal from the trial court's judgment. The first assignment of error states:

{¶ 9} THE TRIAL COURT ERRED IN DIVIDING THE PARTIES' PROPERTY.

{¶ 10} Dr. Dorsey raises issues with respect to the values the trial court assigned to Ms. Dorsey's Mercedes and to his life insurance policy, the credit he was given in exchange for the Mercedes, and the manner in which the trial court divided a Fifth Third securities account.

{¶ 11} A trial court has broad discretion in determining an equitable property division in divorce cases. *Berish v. Berish*, 69 Ohio St.2d 318, 319, 432 N.E.2d 183 (1982),

citing *Cherry v. Cherry*, 66 Ohio St.2d 348, 355, 421 N.E.2d 1293 (1981); *Kapp v. Kapp*, 2d Dist. Clark No. 2003-CA-9, 2005-Ohio-6830, ¶ 21. However, if the trial court abuses that discretion, a reviewing court may modify or reverse the property division. *Berish* at 319. A trial court abuses its discretion when it makes a decision that is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 12} Dr. Dorsey's argument with respect to the Mercedes is threefold: 1) he claims that the trial court should have valued the vehicle at $73,172, because that was its "book value" at his medical practice; 2) he asserts that Ms. Dorsey should more fully share the burden of the "taxable event" created by the transfer of the car out of his practice; and 3) he contends that, when the trial court divided the value of the medical practice equally, it gave Ms. Dorsey half of the book value of the car, rather than half of the fair market value, and that he was entitled to a credit for half the difference between these two amounts.

{¶ 13} All of Dr. Dorsey's arguments about the Mercedes start with the premise that the trial court should have used the Mercedes's book value, rather than its fair market value, in its calculations. He has cited no authority for this position, and we are aware of none. Traditionally, the book value of an asset is its cost less depreciation, whereas fair market value is the amount for which the property would change hands between a willing buyer and a willing seller on the open market. See *Vadakin v. Vadakin*, 4th Dist. Washington No. 95CA49, 1997 WL 325319, fn. 4 (June 11, 1997), citing Black's Law Dictionary (5th Ed.1979) 165. "[T]here is often times little correlation between 'book value' and 'fair market value.'" *Id.*

{¶ 14} Moreover, an automobile is not depreciable when owned by an individual

(or individuals), but it often is depreciable when held by a business. The Dorseys – or the medical practice entity – enjoyed tax advantages by choosing to title the Mercedes in the business's name, which would otherwise have been unavailable to them, although the parties acknowledge that little, if any, use of the car related to the business. The parties' choice to title the car in this manner, and to depreciate it, does not present a compelling reason for the trial court to use the book value, rather than the fair market value, for purposes of property division in the divorce. The trial court did not abuse its discretion in valuing this asset at its fair market value.

{¶ 15} Dr. Dorsey further argues that Ms. Dorsey should have been required to share the burden of the "taxable event" created by the transfer of the car out of his practice.

{¶ 16} Conflicting evidence was presented about the ways in which the car might have been transferred to Ms. Dorsey in the divorce and the tax ramifications (if any) of those options. Based on the assumptions that the fair market value of the car was $50,000 and the outstanding debt on the car was $18,000, Dr. Dorsey's expert, Candace DeClark Peace, stated that the transfer of the car out of the practice would create "a net gain of 32,000." DeClark Peace further testified that, at an effective tax rate of 45%, Dr. Dorsey would have to earn $58,000 to "have the $32,000 differential left to pay the company." She testified that, if, alternatively, Ms. Dorsey purchased the car from the practice, there would be no taxable event.

{¶ 17} The Mercedes, as well as a Lincoln Navigator and a Lexus, were on the books of the practice at the time of the divorce. The trial court ordered that the Navigator would remain an asset of the practice; the Lexus was awarded to Dr. Dorsey. There was no

testimony about the various "values" of the Lexus. Ms. Dorsey's expert, John R. Bosse, stated that the book value of the Navigator was zero, but its "Blue Book" value was over $11,500. (Ms. Dorsey has suggested that she should get some credit for the fair market value of the cars awarded to Dr. Dorsey or maintained by the medical practice in the divorce.) Bosse acknowledged that the Mercedes had a book value of $73,172, and that a loan on this vehicle was still reflected on the practice's books. He stated that the debt on the Mercedes could be accounted for "on the personal side" or "within the corporation." Bosse did not testify about the tax consequences, if any, of transferring the Mercedes out of the practice.

{¶ 18} After finding that that the fair market value of the Mercedes was $50,000, and that this amount was included in the value of Dr. Dorsey's medical practice, the trial court further stated: "Husband shall cause the [practice] to transfer title, free of any debt, to Wife; and Husband shall receive a credit of $27,000 toward the ultimate property settlement, representing the income tax liability that will result from the transfer of the title to the Mercedes to Wife."

{¶ 19} Based on the evidence presented and the trial court's statements, the reasonableness of the trial court's findings with respect to the Mercedes cannot be determined. For example, the trial court referred to a "tax liability" of $27,000, but no evidence was presented that the transfer of the Mercedes would require Dr. Dorsey or the corporation to pay $27,000 in taxes. Rather, DeClark Peace testified that the transfer would result in the realization of a "net gain" of $32,000 and that Dr. Dorsey paid an effective tax rate of 45%. DeClark Peace testified that Dr. Dorsey would need to earn $58,000 to net

$32,000 (presuming he were required to pay the practice that amount). Dr. Dorsey discussed a $26,000 differential in his brief, a calculation which may rely on these numbers ($58,000 - $32,000 = $26,000). However, both the trial court's Decision and the Final Judgment and Decree of Divorce erroneously equate a "taxable event" with the amount of tax owed as a result of that event. Neither expert quantified how much Dr. Dorsey would be required to pay in taxes on any gain and, although DeClark Peace testified that Dr. Dorsey would have to earn $58,000 to "pay the tax, to have the $32,000 differential left to pay the company," no evidence was presented that he would, in fact, be required to reimburse the practice for this diminution in value.

{¶ 20}    Ms. Dorsey states in her brief that she believed the $27,000 credit awarded to Dr. Dorsey in exchange for the transfer of the Mercedes represented (roughly) half of its fair market value, and that she was willing to pay this amount rather than quibble over the difference between $25,000 and $27,000, because it was "close enough." However, we are unable to determine by what reasoning and calculations the trial court arrived at its decision to credit Dr. Dorsey with $27,000.

{¶ 21}    Finally, Dr. Dorsey argues that, when the trial court divided the value of the medical practice equally, it gave Ms. Dorsey half of the book value of the Mercedes, rather than half of the fair market value; he contends that, in doing so, the court overcompensated Ms. Dorsey, and that he was entitled to a credit for half the difference between these two amounts. We share Dr. Dorsey's concern that the trial court may have double-counted some or all of the value of the Mercedes by awarding Ms. Dorsey the car and half of the value of the medical practice, without seeming to account for the fact that the Mercedes was included

in the value of the medical practice.

{¶ 22} In sum, we are unable to follow the trial court's reasoning or to determine whether the trial court abused its discretion in awarding a $27,000 credit to Dr. Dorsey to offset the award of the Mercedes to Ms. Dorsey. We will reverse the trial court's judgment with respect to this asset and remand for the trial court to recalculate or provide a more complete explanation for its distribution of the value associated with the Mercedes.

{¶ 23} Dr. Dorsey also contends that the trial court abused its discretion in calculating the value of his life insurance policy.

{¶ 24} Dr. Dorsey's life insurance policy provided coverage of $4 million. An annual premium payment of $102,760 was paid on March 25 of each year. According to a document presented by each party and prepared by Country Life Insurance Company, the cash value of the policy as of July 25, 2011, was $608,066.67, and the cash surrender value on the same date was $830,866.68. Dr. Dorsey also attached an email to his trial exhibit in which he asked an agent of Country Financial[1] about the "cash surrender value" of the policy as of July 1, 2010, the date the parties had agreed to use as the end of the marriage. The agent's email in response indicated that the "cash value" of the policy was $486,139.04 as of July 1, 2010, and the "total cash value" was $686,731.27 as of that date. Ms. Dorsey did not object to the email portion of Dr. Dorsey's exhibit or refute the values reflected therein, except to note, on appeal, that the email uses the term "total cash value" rather than

[1]Some of the documents offered into evidence are on the letterhead of "Country Financial," and others are on letterhead of "Country Insurance and Financial Services." Neither party has asserted that the distinction, if any, is relevant.

"cash surrender value."[2]

{¶ 25}  The parties also disputed whether the portion of the premium that was "unearned" as of July 1, 2010, should have been deducted from the value of the policy before the policy was divided between the parties.  The "earned" portion of the premium was the portion attributable to the period from March 25, 2010, when the premium was paid, through July 1, 2010, the de facto end of the marriage; the "unearned" portion was the portion of the premium payment that covered the cost of the policy from July 1 through the payment of the next premium on March 25, 2011, a period outside the marriage according to the parties' agreement to distribute assets as of July 1, 2010.   The parties do not dispute that the portion of the premium attributable to the period from July 1 through March 25, each year, is $75,356.99.  Dr. Dorsey argued that the "unearned premium" should have been deducted from the cash surrender value of the policy.  But Ms. Dorsey claimed that, because the March 2010 premium had been paid from marital assets, there was no reason to deduct the unearned premium from the value of the life insurance policy.

{¶ 26}  In the trial court, Dr. Dorsey argued, based on the email from the Country Financial agent, that the value of the insurance policy was $686,731.27 on July 1, 2010, less the unearned premium as of July 1, 2010 ($75,356.99), for a policy value of $611,374.28.  Ms. Dorsey argued that the "only evidence" of the value of the policy was   the value on July

---

[2]Ms. Dorsey argues in her brief that "[t]here is a difference between the terms "cash surrender value" and "total cash value" as used in the email, but she does not identify the difference.   She then states that Dr. Dorsey "fails to distinguish between the two values."   In our view, based on the question about "cash surrender value" posed in the email, and a comparison of the values offered by the insurance company as of July 1, 2010, and July 25, 2011, there is no genuine question that the "total cash value" reflected in the email response correlates to the "cash surrender value."

25, 2011 ($830,866.68), from which the March 2011 annual premium payment ($102,760) should have been deducted, for a total value of $728,106.68.

{¶ 27} The trial court stated that the cash surrender value of the policy would be "divided equally * * * as of July 1, 2010, plus or minus interest, gains or losses associated therewith until the date of division." But its calculation of the value of the policy ($728,106) appears to have been based on the values presented as of July 25, 2011. The court seems to have used the cash surrender value as of July 25, 2011 ($830,866.68), and deducted from it the March 2011 annual premium ($102,760) to arrive at the policy value of $728,106 ($830,866.68 - $102,760 = $728,106.68). This is the calculation advocated by Ms. Dorsey. However, this calculation cannot reasonably be viewed as being based on the value of the policy as of July 1, 2010, especially in light of the unrefuted evidence from Country Financial, offered by Dr. Dorsey without objection, that the cash surrender value as of July 1, 2010, was $686,731.27.

{¶ 28} The trial court had broad discretion regarding the admissibility of evidence. *Preston v. Shutway*, 2013-Ohio-185, 986 N.E.2d 584, ¶ 22 (2d Dist.). For example, it might have rejected the email offered by Dr. Dorsey as evidence of the July 1, 2010, value of the policy for evidentiary reasons. However, the record of this case reflects no such concern about this evidence. Moreover, if the trial court had rejected this evidence, it would have been forced to calculate the value of the policy using a date other than July 1, 2010, because there was no other evidence as to the value of the policy on that date. Ms. Dorsey's calculation, which was adopted by the trial court and relied on the value of the policy as of July 25, 2011, less the price paid for the 2011 premium, might have represented a reasonable,

alternate date of valuation, in the absence of evidence about the value as of July 1, 2010. But the court did not expressly state, on the record, that it intended to calculate the value of the life insurance policy using a date other than the one used to calculate the value of all the other assets. Thus, we will remand the matter of the value of the life insurance policy to the trial court for recalculation or for explanation of its use of a date other than the "de facto" end of marriage in its calculation.

{¶ 29} The trial court did not expressly address the parties' dispute about whether the unearned premiums should be deducted from the value of the policy. However, because the trial court could have reasonably concluded that the unearned portion of the premium was marital property, and thus that a deduction of this amount was unnecessary, we find no abuse of discretion in the trial court's failure to deduct this amount or to expressly address this issue.

{¶ 30} Finally, Dr. Dorsey contends that the trial court erred in awarding a disproportionate share of the Fifth Third securities account to Ms. Dorsey. At the time of trial, this account had a value of $152,365, but the court found that Dr. Dorsey had previously withdrawn $100,000 from the account "inappropriately."[3] (The court did not characterize it as "financial misconduct," as defined at R.C. 3105.171(E)(4).) The court awarded the account to Ms. Dorsey and, additionally, ordered Dr. Dorsey to pay her $50,000 representing half of the funds he withdrew. In other words, Ms. Dorsey was awarded approximately $202,365 (the $152,365 in the account, plus $50,000) from an account that originally

---

[3] It is unclear from the record why the trial court valued this asset at the time of trial, rather than as of July 1, 2010, but the parties do not object to the court's use of the trial date. It is also unclear when Dr. Dorsey's withdrawal occurred.

contained approximately $250,000, or about 80% of this account. Ms. Dorsey seems to concede that this division was unequal. But she says that this unequal division of the Fifth Third account was designed to offset Dr. Dorsey's retention of "the non-divisible asset," i.e., his medical practice, or to reduce the amount he would have to pay to effectuate an equal division of the assets. In other words, Ms. Dorsey asserts that, although one asset may have been divided unequally, the award must be viewed as a whole.

{¶ 31} There is nothing in the record to suggest that the trial court intentionally awarded a disproportionate share of the Fifth Third account to Ms. Dorsey for either of the purposes she identifies. Ms. Dorsey was awarded half of the value of the medical practice, leaving no reason for her to be further compensated for Dr. Dorsey's retention of this asset. And the court's judgment expressly offsets other property awards before ordering Dr. Dorsey to make a payment to Ms. Dorsey to equalize the division; if the unequal treatment of the Fifth Third account were intended to reduce Dr. Dorsey's payment to Ms. Dorsey, it would have been mentioned in the court's discussion of "Equalization of Marital Assets," and it was not. Throughout its judgment, the trial court took measures to equalize the distribution of assets. There is no basis to conclude that it intended to unequally distribute the Fifth Third account.

{¶ 32} The Fifth Third account originally contained approximately $250,000. It is unclear on what basis the trial court concluded that Dr. Dorsey's withdrawal of $100,000 was "inappropriate," but even if it were so, more than half of the funds remained, and Ms. Dorsey requested only that she receive half of the $250,000. Thus, each of the parties would have been entitled to approximately $125,000. It was unnecessary for Dr. Dorsey to repay any

funds to Ms. Dorsey to effectuate such a division. Moreover, in awarding Ms. Dorsey $152,000, the court awarded her more than half of the account, an error which was compounded by the court's order that Dr. Dorsey repay $50,000 more to Ms. Dorsey. The court should have awarded $100,000 to Ms. Dorsey to offset Dr. Dorsey's withdrawal, and then divided the remaining balance. Thus, each party would have – and should have – netted approximately $125,000 from this account. Because the trial court's disparate treatment of the Fifth Third account, without explanation, was not in accord with its handling of the parties' assets in all other respects, we conclude that the trial court erred in its calculation.

**{¶ 33}** The first assignment of error is sustained.

**{¶ 34}** The second assignment of error states:

THE TRIAL COURT ERRED IN RESERVING JURISDICTION OVER THE PARTIES' 2011 TAX RETURN.

**{¶ 35}** Dr. Dorsey claims that the trial court erred in retaining jurisdiction over the parties' 2011 tax return (i.e., the division of the refund, if any) because no issue related to that return was before the court at the hearing.

**{¶ 36}** In its decision, the court noted that Dr. Dorsey had received and retained the parties' tax refunds for 2010, totaling over $37,000; to offset Dr. Dorsey's retention of the tax refunds, Ms. Dorsey withdrew $10,000 from a marital account and charged $27,000 to a joint credit card, which Dr. Dorsey paid. Thus, the court noted that the parties had not amicably divided the previous tax return.

**{¶ 37}** In June 2012, Ms. Dorsey filed a motion that the trial court divide the 2011 tax refunds, which she believed Dr. Dorsey had "somehow, converted * * * to his personal

use," notwithstanding that the refund checks should have been payable to both parties. According to Ms. Dorsey, the parties were entitled to a $23,097 refund from their federal tax return and a $39,928 refund from their state return in 2011. She claimed that she was entitled to half of this amount, or $31,512.50.

{¶ 38} Dr. Dorsey emphasizes that the de facto end of the marriage was in 2010, that the 2011 tax return/refund was not addressed at the hearing, and that neither party "consented in writing" to the court's retention of jurisdiction over this issue. These arguments are unpersuasive, as the hearing occurred in 2011, before any tax return for that year could possibly have been filed, and the decree of divorce was not filed until October 2012, even if the parties agreed to use an earlier date as the end of the marriage for purposes of division of property. Thus, the parties were married, under the law, throughout 2011, and Ms. Dorsey asserts that they filed joint tax returns for that year.

{¶ 39} The trial court did not abuse its discretion in treating the 2011 tax refunds as marital assets and in assuming that the parties would not agree on the distribution of those assets without the court's involvement. Thus, the court did not abuse its discretion in retaining jurisdiction over this issue.

{¶ 40} The second assignment of error is overruled.

{¶ 41} The judgment of the trial court will be affirmed in part and reversed in part. This matter will be remanded for clarification of the court's orders with respect to the distribution of the Mercedes and the valuation of Dr. Dorsey's life insurance policy, and for redistribution of the Fifth Third account.

. . . . . . . . . .

[Cite as *Dorsey v. Dorsey*, 2013-Ohio-4237.]
DONOVAN, J. and WELBAUM, J., concur.

Copies mailed to:

Charles D. Lowe
John D. Smith
Andrew P. Meier
Hon. Timothy D. Wood