[Cite as *Dorsey v. Dorsey*, 2017-Ohio-5826.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| VICKI S. DORSEY | : | |
| | : | |
| *Plaintiff-Appellee/Cross-Appellant* | : | Appellate Case No. 27338 |
| | : | |
| | : | Trial Court Case No. 2009-LS-23 |
| v. | : | |
| | : | (Appeal from Domestic Relations |
| WILLIAM R. DORSEY, D.O. | : | Court) |
| | : | |
| *Defendant-Appellant/Cross-Appellee* | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 14th day of July, 2017.

. . . . . . . . . . .

CHARLES D. LOWE, Atty. Reg. No. 0033209, 8087 Washington Village Drive, Suite 102, Dayton, Ohio 45458
  Attorney for Plaintiff-Appellee/Cross-Appellant

JOHN D. SMITH, Atty. Reg. No. 0018138, ANDREW P. MEIER, Atty. Reg. No. 0083343, 140 North Main Street, Suite B, Springboro, Ohio 45066
  Attorneys for Defendant-Appellant/Cross-Appellee

. . . . . . . . . . . . .

WELBAUM, J.

**{¶ 1}** In this case, Defendant-Appellant/Cross-Appellee, William Dorsey, appeals from a judgment dividing the parties' property and assessing five percent interest on the unpaid amount of a property settlement awarded to Plaintiff-Appellee/Cross-Appellant, Vicki Dorsey.[1]   Vicki argues in her cross-appeal that the trial court erred in deciding the accrual date of the interest on the property settlement.

**{¶ 2}** We conclude that the trial court erred in calculating how a Mercedes automobile was credited in equalizing the property division.   The court did not err in any other respects.   Accordingly, the judgment of the trial court will be reversed in part, only as to said allocation.   On remand, the court will order that the total amount required to equalize the property division, as of September 24, 2015, is $275,804.50.   In all other respects, the judgment of the trial court is affirmed.

## I.   Facts and Course of Proceedings

**{¶ 3}** This is the third time William and Vicki have been before our court in connection with their divorce decree, which was filed in October 2012.   *See Dorsey v. Dorsey*, 2d Dist. Montgomery No. 25436, 2013-Ohio-4237.

**{¶ 4}** The record indicates that the parties were married in 1982.   In July 2009, Vicki filed a complaint for legal separation, and William subsequently filed an amended answer and counterclaim for divorce in October 2009.   The case progressed slowly, and the divorce trial did not take place until late September 2011.

**{¶ 5}** William was a doctor, and the parties had considerable assets, including his

---

[1] To avoid confusion, we will refer to the parties as William and Vicki.

medical practice, a marital home, a vacation home, several rental properties, retirement accounts, and a life insurance policy with a cash surrender value of several hundred thousand dollars. William also made a substantial income from his medical practice. Vicki was not employed, and the parties' two children were emancipated before the divorce. At trial, the parties stipulated that the de facto termination of their marriage was on July 1, 2010.

{¶ 6} In February 2012, William filed a motion to supplement the evidence because certain litigation involving Caresource had been resolved. At that point, the trial court had not yet issued a decision regarding the divorce decree, and scheduled a hearing on William's motion for May 8, 2012. Subsequently, in late June 2012, Vicki filed a motion asking the court to divide the parties' 2011 federal and state tax refunds, which had been received in 2012, and which William apparently had cashed without giving Vicki any of the money. The court set a hearing on this motion for August 15, 2012, but the hearing was continued.

{¶ 7} In September 2012, the trial court filed a decision regarding the contested divorce, and a final judgment and decree of divorce was then issued on October 15, 2012. The parties had stipulated to the division of some assets, like ownership of real estate and personal property, and the court resolved the remaining issues. Among other things, the trial court awarded Vicki one-half the value of the medical practice, which included a Mercedes automobile, one-half the cash surrender value of two life insurance policies the parties held, and the remaining amount of money in a Fifth Third Bank securities account. In addition, William was to pay Vicki $50,000 for assets he had improperly withdrawn from the Fifth Third account. *Dorsey*, 2d Dist. Montgomery No. 25436, 2013-Ohio-4237, at ¶

4-6.

{¶ 8} William appealed to our court, asserting error about the following matters: (1) the value assigned to the Mercedes awarded to Vicki and the credit he was given in connection with the Mercedes; (2) the value assigned to his life insurance policy; and (3) the way in which the trial court had divided the Fifth Third account. *Id.*at ¶ 10.

{¶ 9} Concerning the Mercedes, we rejected William's argument that the trial court had undervalued the Mercedes by using a fair market value of $50,000. *Id.* at ¶ 12-14. However, we also concluded that we could not determine the reasonableness of the court's decision about disposition of the Mercedes. *Id.* at ¶ 19.

{¶ 10} Specifically, the court instructed that William should cause the practice to transfer the Mercedes to Vicki free of debt. The court also credited William with $27,000 toward the property settlement based on the income tax liability resulting from the transfer of the Mercedes. *Id.* at ¶ 19. We stated that we could not find evidence that the transfer would require William or the corporation to pay $27,000 in taxes, nor had either expert testified how much William would be required to pay in taxes on any gain. *Id.* We also expressed concern over whether the "court may have double-counted some or all of the value of the Mercedes by awarding Ms. Dorsey the car and half of the value of the medical practice, without seeming to account for the fact that the Mercedes was included in the value of the medical practice." *Id.* at ¶ 21.

{¶ 11} Regarding the life-insurance policy, we concluded that the trial court had erred in using a cash surrender value of $728,106, which appeared to have been based on the value of the policy on July 25, 2011, rather than July 1, 2010 (the de facto termination of the marriage). *Dorsey*, 2d Dist. Montgomery No. 25436, 2013-Ohio-4237,

at ¶ 26-27.   We noted that the trial court could have used a date other than the de facto termination date, but the court did not state that it intended to do so.   *Id*. at ¶ 28.

{¶ 12} We further held that the trial court erred in awarding the entire balance in the Fifth Third account and an additional $50,000 to Vicki.   The original amount in the account was $250,000, and each party would have been entitled to $125,000 under an equal distribution of assets.   *Id*. at ¶ 32.   The court did not find financial misconduct, nor did it use the unequal division to reduce William's payment of marital property to Vicki. *Id*. at ¶ 31-32.

{¶ 13} Finally, we rejected William's argument that the trial court abused its discretion in reserving jurisdiction over the issue of the 2011 tax return.   We noted that the divorce hearing took place in 2011, before the tax return could have been filed, and that the parties were still married, under the law, throughout 2011.   *Id*. at ¶ 35-39.

{¶ 14}   As a result of our findings, we reversed the judgment in part, affirmed it in part, and remanded the case "for clarification of the court's orders with respect to the distribution of the Mercedes and the valuation of Dr. Dorsey's life insurance policy, and for redistribution of the Fifth Third account."   *Id*. at ¶ 41.   Our decision was issued on September 27, 2013.

{¶ 15} On remand, the court set a trial date for May 22, 2014; ultimately, the trial took place on June 26, 2014.   In the meantime, Vicki filed a motion in May 2014, asking the court to award her interest at the statutory rate from October 15, 2012 (the original judgment date) on the amount required to equalize the property settlement.

{¶ 16} After the hearing, the parties filed joint stipulations on September 9, 2014, to assist the court in deciding the issues pertaining to the life insurance policies.   The

court then filed a decision on March 16, 2015, resolving the issues other than the interest, and ordered Vicki's attorney to prepare an amendment to the final decree of divorce. However on May 4, 2015, the court vacated this decision and set the matter for a pretrial. On August 8, 2015, the court filed another decision concluding that the cash value of William's life insurance policy was $686,731.27, that the $75,356.99 premium was paid with marital funds, and that the premium should not be subtracted. Vicki's share of the cash value of the life insurance policy, therefore, was $343,365.63. The court also concluded that the Fifth Third account would be divided equally, with $126,182.50 being given to each party.

{¶ 17} In addition, the court divided the 2011 tax returns equally, which gave Vicki an additional $31,512.50. The court held that the assets retained by the parties (not including the cash surrender of the life insurance) were as follows: William – $1,351,110; Vicki – $390,000. After offsetting certain amounts, the court concluded that William should pay Vicki $442,067.50 within 60 days of the filing of the amendment to the divorce decree.

{¶ 18} The court concluded that further testimony was needed on the matter of the increase in value of the insurance policy and interest on the unpaid property settlement. As a result, the court set another hearing for October 28, 2015.

{¶ 19} On September 24, 2015, the court filed an amendment to the final divorce decree, and William filed a notice of appeal from that decision on October 1, 2015. We dismissed the appeal in January 2016, based on the lack of a final appealable order. See Dorsey v. Dorsey, 2d Dist. Montgomery No. 26850 (Jan. 27, 2016).

{¶ 20} In April 2016, the parties agreed that the increase in the value of William's

life insurance policy would be determined by applying a five percent interest rate, compounded annually. As was noted, according to the cash surrender value assigned by the court, Vicki's share on July 1, 2010 would have been $343,365.63. As of March 31, 2016, the increase in the value of her share would have been $111,254, with a per diem additional amount due of $60.03 from that point on.

{¶ 21} At that time, Vicki suggested, with respect to the remaining unpaid amount of the property division ($287,304), that the court should apply either a three or five percent interest rate from October 15, 2012.[2] In contrast, William argued that the interest rate should be three percent from November 24, 2015, which was 60 days after the court's decision on the property division.

{¶ 22} On September 8, 2016, the trial court filed an amended decision, noting that William had paid the amount due on the life insurance policy ($458,489.50), with a reservation of right to appeal that issue, and that the only remaining issue was the issue of interest on the property settlement. The court held that interest would appropriately be awarded as of September 24, 2015, the date of the amendment to the final decree and judgment of divorce, at a rate of five percent per annum. Vicki's counsel was ordered to prepare a judgment entry, and a second amendment to the divorce decree was then filed on November 8, 2016.

{¶ 23} William filed a notice of appeal on November 9, 2016, and Vicki filed a notice of cross-appeal on November 18, 2016.

## II. Did the Court Err Again in Dividing the Parties' Property?

---

[2] William had previously paid $154,763 toward the property division.

{¶ 24} William's First Assignment of Error states that:

The Trial Court Erred Again in Dividing the Parties' Property.

{¶ 25} Under this assignment of error, William addresses three issues: (1) distribution of the Mercedes; (2) inclusion of unearned premium in the value of the life insurance policy; and (3) the award to Vicki of half of the 2011 property tax refund. We will address each item separately.

## A. Distribution of the Mercedes

{¶ 26} Under this assignment of error, William first contends that the trial court erred in failing to deduct the $50,000 fair market value of the Mercedes from the value of the medical practice. Vicki agrees, and states in her brief that she should pay William $25,000 for his one-half interest in the car.

{¶ 27} We note that the trial court ordered Vicki to pay $25,000 for the Mercedes in its August 5, 2015 decision and in the September 24, 2015 Amendment to the Final Judgment and Decree of Divorce. Doc. #42, p.2; Doc.#45, p. 1.[3] However, the court did not deduct any of the value of the Mercedes from the assets of the medical practice, which, including the $50,000 value of the Mercedes, had been previously valued at $640,293 by Vicki's trial expert. This was consistent with our concern in the prior appeal about double-counting some or all of the value of the Mercedes. *See Dorsey*, 2d Dist. Montgomery No. 254362013-Ohio-4237, at ¶ 21.

{¶ 28} The Mercedes was transferred to Vicki in December 2012, during the

---

[3] These docket references are to the docket sheet filed in the second appeal (Case No. 26850).

appeal, and was no longer a corporate asset in September 2015, when the trial court issued its amendment to the divorce decree.[4] Nonetheless, it was an asset of the corporation at the de facto termination of the marriage, and was valued at $50,000. Instead of accounting for the fact that Vicki had possession of this asset, the trial court still found the value of the practice to be $640,293, when it should have been valued at $590,293. As a result, the court's calculation of the amount due to Vicki ($480,555 to equalize the assets) was erroneous.

{¶ 29} However, the court did, in fact, reduce the amount of the property division payment to Vicki by $25,000 to account for William's entitlement to half the value of the Mercedes. As was noted, the court arrived at a figure of $480,555 to equalize the assets, and then offset other amounts against that, including the $25,000 for the Mercedes, to reach a final figure of $442,067.50. As a result, Vicki was incorrect when she stated in her brief that $50,000 should have been deducted from the value of the medical practice, and that she should also pay William $25,000 for his interest in the Mercedes. The trial court had already accounted for William's half-interest.

{¶ 30} Using William's theory that the $50,000 value of the Mercedes should have been deducted from the value of the practice, and that he should then be credited with an additional $25,000 would result in the reverse situation of what we were concerned about in the initial appeal, i.e., some of the value of the Mercedes would be counted twice in equalizing the assets. However, this time, the advantage would be to William.

{¶ 31} In the table that follows, we have reconfigured the figures in the September

---

[4] In fact, according to the evidence at the June 2014 hearing, the medical practice, itself, was apparently sold in November 2012.

24, 2015 amended judgment entry to account for the correct valuation of the property.

| William | Vicki |
|---|---|
| Centerville real estate - $452,052 | Springboro real estate - $383,000 |
| Medical Practice- $590,293 | Sycamore membership - $7,000 |
| Medical Building - $20,000 | Mercedes auto - $50,000 |
| Fifth Third Bank acct. - $252,365 | |
| Lexus auto - $13,400 | |
| Total - $1,328,110 | Total - $440,000 |
| Amount due to Vicki to equalize: $444,055[5] | |

{¶ 32} As was noted, after arriving at the initial figure of $480,555 to equalize, the trial court then offset the following amounts: $5,000 William owed to Vicki for bedroom furniture; $31,512.50 that William owed Vicki for the 2011 tax refund; $25,000 Vicki owed to William for the Mercedes; and $50,000 that Vicki owed William for expenses associated with their properties in Tennessee.   Adding and subtracting these amounts resulted in a final figure of $442,067.50 that would be due to Vicki.

{¶ 33} In contrast, in our calculation, the $25,000 payment to William for the Mercedes would no longer be included, because the value of that asset is accounted for

---

[5] The equalization amount is calculated as follows:   $1,328,110 plus $440,000 equals $1,768,110 (Total assets).   $1,768,110 divided by two equals $884,055, or the amount of assets each party should have.   $884,055 minus $440,000 (Vicki's assets) equals $444,055, which is the amount required to give Vicki an equal share of assets. $1,328,110 (William's assets) minus $444,055 equals $884,055.   Thus, both parties would be entitled to $884,055, or an equal share of the assets, before any further offsets.

by adding $50,000 to Vicki's assets. Offsetting the remaining above amounts, including the tax refund, bedroom furniture, and Tennessee property expense, results in a final figure of $430,567.50.[6]

{¶ 34} The court's final figure, thus, should have been $430,567.50, rather than $442,067.50. Since William had already paid Vicki $154,763, the total amount owing as of September 24, 2015, would have been $275,804.50 (prior to calculation of any interest), rather than the $287,304 the court ultimately found due.

{¶ 35} William's second contention regarding the Mercedes is that the trial court erred because it did not require Vicki to pay him for additional income tax that resulted from the transfer. In support of his argument, William contends that he initially proposed in the trial court that Vicki buy the automobile from the corporation, which would not have resulted in a taxable event. He notes that, instead, the court ordered that the car be transferred to Vicki, and this was accomplished in December 2012. According to William, this resulted in tax to him of $15,205 because he was required to report $33,874 on his 2012 income tax return as a result of the transfer of the Mercedes from the practice to him. William, therefore, contends that the trial court should have ordered Vicki to pay one-half the tax, or $7,602.50.

{¶ 36} "When reviewing the trial court's marital property division, the reviewing court is limited to determining whether, considering the totality of the circumstances, the trial court abused its discretion in fashioning the award." (Citation omitted.) *James v. James*, 101 Ohio App.3d 668, 680, 656 N.E.2d 399 (2d Dist.1995). An abuse of

---

[6] $444,055 plus $36,512.50 (tax refund and bedroom) equals $480,567.50. $480,567.50 minus $50,000 (property expenses) equals $430,567.50.

discretion indicates a trial court attitude that is arbitrary, unconscionable, or unreasonable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). We have often stressed that "[m]ost abuses of discretion 'will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary.' " *Kossoudji v. Stamps*, 2016-Ohio-7693, 65 N.E.3d 815, ¶ 22, quoting *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). (Other citation omitted.) "A decision is unreasonable if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue *de novo*, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result." *AAAA Enterprises* at 161, 553 N.E.2d 597.

**{¶ 37}** The original divorce decree, filed on October 15, 2012, stated, with respect to the Mercedes, that:

Husband shall cause the Corporation to transfer title, free of any debt, to Wife; and Husband shall receive a credit of $27,000 toward the ultimate property settlement, representing the income tax liability that will result from the transfer of the title of the Mercedes to Wife.

Doc. #55, p. 12.[7]

**{¶ 38}** William appealed from the trial court's decision in October 2012, and sold his medical practice in November 2012. During the pendency of the appeal, the Corporation transferred the vehicle to William, who then transferred it to Vicki.

**{¶ 39}** When we considered the provision in the original divorce decree on appeal,

---

[7] This docket reference is to the docket sheet filed in the first appeal (Case No. 25436).

we commented that "[c]onflicting evidence was presented about the ways in which the car might have been transferred to Ms. Dorsey in the divorce and the tax ramifications (if any) of those options." *Dorsey*, 2d Dist. Montgomery No. 25436, 2013-Ohio-4237, at ¶ 16. We concluded that we were "unable to follow the trial court's reasoning or to determine whether the trial court abused its discretion in awarding a $27,000 credit to Dr. Dorsey to offset the award of the Mercedes to Ms. Dorsey." *Id.* at ¶ 22. As a result, we reversed the trial court's judgment regarding the Mercedes, and remanded "for the trial court to recalculate or provide a more complete explanation for its distribution of the value associated with the Mercedes." *Id.*

**{¶ 40}** As was noted, the trial court held a hearing on remand in June 2014, and heard additional evidence from the experts who had previously testified at trial. According to William's accountant, the transfer of the vehicle caused William to include the value of the vehicle (at that time, $33,874) on his 2012 personal tax return, and the tax consequence to him was a total of $15,205 in state, federal, and local taxes. This was because William and the Corporation were separate entities. No copy of William's 2012 tax return was submitted at the hearing.

**{¶ 41}** Vicki's expert testified that the Mercedes could have been transferred with no tax consequences to anyone. Specifically, the 2012 corporate tax return (which was submitted at the hearing) showed that the corporation owed William $156,646 going back to the beginning of 2012. If the amount due to William had been reduced by $33,000, there would have been no tax consequence to anyone. A loss would have been created within the corporation.

**{¶ 42}** Vicki's expert further indicated that William would not have had to account

for forgiving the loan because the corporation was sold in November 2012 prior to the transfer. Since the transaction had already occurred and William had not used this option, Vicki's expert indicated that William could amend his 2012 W-2 to reduce his income by that amount, and amend his tax return to reduce what the corporation owed him.

{¶ 43} Notably, the 2012 corporate tax return also shows that the outstanding shareholder loan to the corporation had increased by $199,090 by the end of 2012. William was the 100% shareholder of the corporation. The corporation also showed a net income loss of $118,667, and paid no income tax. *See* Plaintiff's Ex. 1, admitted at the June 2014 hearing.

{¶ 44} After hearing the evidence, the trial court stated that:

[T]he court attached great significance to the testimony of Mr. Bosse [Vicki's expert] who testified that William could have chosen a method to transfer the Mercedes to Vicki that would have resulted in a non-taxable event. As a result, the court finds that any tax incurred as a result of the transfer of the Mercedes from the corporation to Vicki is the sole responsibility of William.

August 5, 2015 Decision, Doc. #42, p. 3.[8]

{¶ 45} William contends the trial court erred because his transfer was simply in compliance with the trial court's prior order. However, we disagree. The trial court's prior order stated that the *corporation* was to transfer the vehicle to Vicki – and any taxable consequences in that event would have been sustained by the corporation, not by William. Furthermore, the corporation was sold in 2012 and the income tax return for the

---

[8] This reference is to the docket sheet for the appeal in Case No. 26850.

year shows a $118,000 loss and no taxes paid.

{¶ 46} Moreover, instead of having the corporation transfer the vehicle to Vicki, as the trial court had ordered, William chose to have the corporation transfer the vehicle to him, which apparently resulted in taxable consequences to him personally. William could also have chosen the method Bosse mentioned – of reducing the amount the corporation owed William – which would not have resulted in taxable consequences to anyone.

{¶ 47} In addition, since William appealed the trial court's October 2012 decision, he could have attempted to obtain a stay of the judgment if he did not wish to transfer the vehicle pending appeal. *See, e.g., Sergi v. Sergi*, 9th Dist. Summit No. 17550, 1996 WL 233492 (May 8, 1996) (affirming trial court order staying payment pursuant to property division, based on the fact that the cross-appellant had filed adequate security for a stay); *Snyder v. Snyder*, 11th Dist. Geauga No. 2000-G-2307, 2001 WL 1116430, *2-3 (Sept. 21, 2001) (noting that stay of judgment had been granted pending prior appeal in divorce action and that appellant had violated stay when he removed property from appellee's home); *Howard v. Howard,* 2d Dist. Montgomery No. 11479, 1989 WL 109744, *2 (Sept. 19, 1989) (appellant's failure to obtain stay of judgment pending appeal in divorce action allowed trial court to order that appellant's property be transferred to appellee, pursuant to provisions in divorce decree).

{¶ 48} The record does not indicate that William ever attempted to obtain a stay. Instead, he chose to have the corporation transfer the Mercedes to him, thereby incurring any taxes that might be due, rather than following the court's order to have the corporation transfer the vehicle to Vicki. As a result, we find no flaw in the trial court's decision to hold William responsible for any tax consequences.

{¶ 49} Furthermore, the trial court placed significant weight on the testimony of Vicki's expert. We have previously stressed that trial courts are in the best position to weigh witness credibility. *Wichman v. Wichman*, 2d Dist. Greene No. 95-CA-31, 1996 WL 125914, *3, citing *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).

{¶ 50} Accordingly, while the trial court did err in equalizing the property division, the court did not abuse its discretion when it refused to credit William with any amount in connection with the transfer of the Mercedes to Vicki.


B. Value of the Life Insurance Policy

{¶ 51} William's second issue under the First Assignment of Error is that the trial court abused its discretion in allocating the unearned premium for the life insurance policy. In this regard, William argues that even though the unearned premium of $75,356.99 was paid with marital money, the trial court erred by failing to recognize that the unearned portion of the premium was dissipated while the case was pending because Vicki received the benefit of being named as a beneficiary though March 24, 2011.

{¶ 52} In its original decision, the trial court held that the cash surrender value of the life insurance policy was $728,106, which was the value as of July 25, 2011. We concluded that "this calculation cannot reasonably be viewed as being based on the value of the policy as of July 1, 2010, especially in light of the unrefuted evidence from Country Financial, offered by Dr. Dorsey without objection, that the cash surrender value as of July 1, 2010, was $686,731.27." *Dorsey*, 2d Dist. Montgomery No. 25436, 2013-Ohio-4237, at ¶ 27. We commented that the trial court could have chosen to value the asset

on a date different than other assets, but had not expressly said so on the record. *Id.* at ¶ 28. We, therefore, remanded "the matter of the value of the life insurance policy to the trial court for recalculation or for explanation of its use of a date other than the 'de facto' end of marriage in its calculation." *Id.*

{¶ 53} Additionally, we commented in the prior appeal that "[t]he parties * * * disputed whether the portion of the premium that was 'unearned' as of July 1, 2010, should have been deducted from the value of the policy before the policy was divided between the parties." *Id.* at ¶ 25. We noted William's contention that the " 'unearned premium' " of $75,356.99 "should have been deducted from the cash surrender value of the policy." *Id.*

{¶ 54} Concerning this issue, we stated that:

> The trial court did not expressly address the parties' dispute about whether the unearned premiums should be deducted from the value of the policy. However, because the trial court could have reasonably concluded that the unearned portion of the premium was marital property, and thus that a deduction of this amount was unnecessary, we find no abuse of discretion in the trial court's failure to deduct this amount or to expressly address this issue.

*Dorsey* at ¶ 29.

{¶ 55} When the case was remanded, the parties stipulated that the cash surrender value of the policy on July 1, 2010 was $611,374.28. This included a cash value of $486,139.04 and the cash value of paid up additions of $125,235.24. In addition, the parties stipulated that they disputed whether the unearned premium of

$75,356.99 should be included in the cash surrender value of the policy. Joint Stipulations, Doc. #34, pp. 1-2.[9]

**{¶ 56}** In the September 24, 2015 Amendment to Final Judgment and Decree of Divorce, the trial court held that the cash surrender value of the policy on July 1, 2010, was $686,731.27, and that William was not entitled to deduct the premium payment of $75,356.99. Doc. #46, p. 2.[10] In a decision filed before the amendment to the final judgment, the court reasoned that the premium payment should not be deducted because it was paid with marital funds. August 5, 2015 Decision, Doc. #42, p. 3.[11]

**{¶ 57}** As noted previously, we review the trial court's decision for abuse of discretion. *James*, 101 Ohio App.3d at 680, 656 N.E.2d 399. After reviewing the record, we find no abuse of discretion.

**{¶ 58}** As an initial point, William's argument is the same as the one he previously made in the trial court and on appeal, i.e., that the $75,356.99 premium covered the cost of the policy through payment of the next premium in March 2011, which was outside the marriage, and should have been deducted from the cash surrender value of the policy. *Dorsey*, 2d Dist. Montgomery No. 25436, 2013-Ohio-4237, at ¶ 25; Husband's Closing Argument, Doc. #36, p. 5, filed on October 21, 2011 (asserting that the unearned premium should be deducted from the cash surrender value because Vicki was retained as a

---

[9] This reference is to the docket sheet for the appeal in Case No. 26850.

[10] This reference is to the docket sheet for the appeal in Case No. 26850.

[11] This references is to the docket sheet for the appeal in Case No. 26850. To avoid any confusion, we also note that the trial court followed a practice of filing its decisions and then requiring the parties to submit final judgment entries to the court.

beneficiary and the premium was used for her benefit).[12]

{¶ 59} Our prior decision concluded that the trial court did not abuse its discretion in failing to deduct the $75,356.99 premium from the cash value of the policy. *Dorsey* at ¶ 29. Our decision on that issue is the law of the case, which "provides that the decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels." (Citations omitted.) *Nolan v. Nolan*, 11 Ohio St.3d 1, 3, 462 N.E.2d 410 (1984).

{¶ 60} We did not remand the case for further consideration of whether failing to deduct the premium was an abuse of discretion, as we had already ruled on that point. Our concern was over the date the trial court used for calculating the amount of the cash surrender value, and our remand was for a recalculation (presumably to the de facto termination of the marriage), or an explanation of why a different date rather than the de facto termination date was appropriate.

{¶ 61} Even if we were able to consider the matter, the trial court's choice to include the premium in the cash surrender value was not an abuse of discretion. We have already said the court's choice was not an abuse of discretion; absent additional facts, we have no basis for changing the view we have already expressed. However, no additional facts were presented. Accordingly, we cannot find that the trial court abused its discretion by including the $75,356.99 premium in the cash surrender value of the life insurance policy.

C. The 2011 Tax Refund

---

[12] This reference is to the docket sheet for the appeal in Case No. 25436.

{¶ 62} William's final argument under this assignment of error is that the trial court abused its discretion in awarding Vicki one-half of the 2011 tax refund. In 2011, the parties filed a joint tax return and received a refund of $63,025. William's accountant, who prepared the return, calculated the benefit of filing jointly as opposed to filing separately. She noted that if William had filed separately, he would have received a $240 refund on his federal return; by filing jointly, the parties would receive a $23,097 refund. On the state level, filing jointly would produce an additional $862. However, William would have received a minimum refund of about $39,000 whether he filed the state return jointly or separately.

{¶ 63} At the hearing, William's accountant also said she had advised William to move taxable income from 2012 into 2011 because the income tax rates were going to increase in 2012. The accountant did not indicate how much income was moved into 2011. William acted on the accountant's recommendation by filing joint federal and state tax returns, which resulted in total refunds of $63,025. William and Vicki were still married at the time, as their final decree was not filed until October 2012. William did not share any refunds with Vicki, and she filed a motion with the trial court in June 2012, asking the court to award her one-half of the refund.

{¶ 64} This issue was not part of the original appeal, as the trial court had not yet held a hearing on the matter. Ultimately, the trial court heard the matter in June 2014 and decided that the refund should be split equally. The court reasoned that William could have elected to file separately, and that awarding half the refund to Vicki would be equitable.

{¶ 65} William contends that the trial court abused its discretion because the

valuation date of marital assets was July 1, 2010. He argues that under R.C. 3105.171(A)(3)(a) and (A)(6)(b), all income earned or assets acquired after that date were non-marital property. William also claims that the 2011 returns were filed using only his income after the valuation date, and that because corporate assets were used to move money into 2011, this resulted in William paying Vicki twice because the court had already awarded her half of the medical practice. As noted, we review the trial court's decision for abuse of discretion. *James*, 101 Ohio App.3d at 680, 656 N.E.2d 399.

{¶ 66} R.C. 3105.171(A)(2) provides that "during the marriage" means one of the following:

> (a) Except as provided in division (A)(2)(b) of this section, the period of time from the date of the marriage through the date of the final hearing in an action for divorce or in an action for legal separation;

> (b) If the court determines that the use of either or both of the dates specified in division (A)(2)(a) of this section would be inequitable, the court may select dates that it considers equitable in determining marital property. If the court selects dates that it considers equitable in determining marital property, "during the marriage" means the period of time between those dates selected and specified by the court.

{¶ 67} Under R.C. 3105.171(A)(3), "marital property" includes items like personal and real property acquired during the marriage, interests in real or personal property, including retirement benefits acquired during the marriage, income and appreciation on separate property due to efforts by either or both spouses during the marriage, and participant accounts (public employee accounts) transmitted to the account, plus

investment earnings on the account during marriage.

{¶ 68} R.C. 3105.171(A)(6) defines "separate property" as "all real and personal property that is found by the court" to be any of several listed items. These items include:

(i) An inheritance by one spouse by bequest, devise, or descent during the course of the marriage;

(ii) Any real or personal property or interest in real or personal property that was acquired by one spouse prior to the date of the marriage;

(iii) Passive income and appreciation acquired from separate property by one spouse during the marriage;

(iv) Any real or personal property or interest in real or personal property acquired by one spouse after a decree of legal separation issued under section 3105.17 of the Revised Code;

(v) Any real or personal property or interest in real or personal property that is excluded by a valid antenuptial agreement;

(vi) Compensation to a spouse for the spouse's personal injury, except for loss of marital earnings and compensation for expenses paid from marital assets;

(vii) Any gift of any real or personal property or of an interest in real or personal property that is made after the date of the marriage and that is proven by clear and convincing evidence to have been given to only one spouse.

{¶ 69} Although Vicki initially filed for legal separation, no decree of legal separation was issued, so R.C. 3105.171(A)(6)(iv) does not apply. The remainder of the

items in R.C. 3105.171(A)(6) are not helpful, as they relate to items like inheritances, gifts, compensation for personal injury, and so forth, that occur during a marriage.

{¶ 70} R.C. 3105.171(C)(1) provides for an equal division of property unless it is inequitable, and R.C. 3105.171(C)(2) specifically states that "[e]ach spouse shall be considered to have contributed equally to the production and acquisition of marital property."

{¶ 71} "Generally, the mere fact that a married party filed a separate tax return does not transform any resulting tax refunds into his or her separate property." *Rosenberger v. Rosenberger*, 11th Dist. Geauga No. 2004-G-2555, 2005-Ohio-1790, ¶ 80, citing *Schiesswohl v. Schiesswohl*, 9th Dist. Summit No. 21629, 2004-Ohio-1615, ¶ 38. "However, the court may examine the circumstances surrounding the disputed asset, i.e., a tax refund, and determine that such asset was not available for an equitable division because it was not acquired during the marriage." *Id.* Conversely, the court may also decide that the asset was acquired during the marriage. "[A] person may file her taxes as she chooses; however, if she unilaterally files separately, causes a larger tax liability for her husband, and is in the process of getting divorced, then she may find that the court in its discretion orders her to pay not only half of the marital tax liability but also the excess portion that is due to her unilaterally filing separately." *Norris v. Norris*, 7th Dist. Mahoning No. 01 CA 173, 2002-Ohio-5211, ¶ 18. Again, a party may also choose to file jointly and reap the benefit of doing so. That does not mean the party is not required to share a refund that results.

{¶ 72} As support for his position, William cites our prior decision in *Office v. Office*, 2d Dist. Montgomery No. 15298, 1997 WL 18043 (Jan. 17, 1997). William stresses the

statement in our opinion that:

> We believe that the significant facts are that the right to the refund accrued after the de facto date of the termination of the marriage and that Lynn did not share in suffering the net operating loss which generated the right to the refund. Based upon those facts, we conclude that the refunds were separate property.

*Id.* at *15.

**{¶ 73}** *Office* presented a different situation, however, and actually supports the trial court's decision to equitably divide the tax refund. In *Office*, the parties separated in March 1990, and were ultimately divorced in December 1994. *Id*. at *1. Prior to the filing of the divorce decree, the trial court decided, for purposes of support and property division, that the de facto termination date of the marriage was March 1, 1990. *Id*.

**{¶ 74}** After the de facto termination date, the husband filed an amended tax return to claim a "year-end net operating loss for 1990." *Id*. at *13. The parties had filed a joint tax return for that year, and the loss created an overpayment, for which the husband obtained a refund. *Id*. In addition, the husband carried the loss over to prior years and received refunds for those years as well. *Id*. The trial court treated the refunds as martial assets and divided them. *Id*. at *4. On appeal, the husband claimed the trial court erred in considering the refunds marital assets instead of separate property. *Id*.

**{¶ 75}** To resolve the issue, we considered several out-of-state cases as well as an Internal Revenue Service ruling. The court decisions focused on the fact that at the time of the divorce, the parties had paid taxes and the right to the refund did not exist. Operating losses occurred *after* the divorce and were not marital property. Thus, the ex-

spouses were not entitled to share in a loss that was carried back to taxable years when the parties were married. *Office*, 2d Dist. Montgomery No. 15298, 1997 WL 18043, at *13-14, citing *Jankord v. Jankord*, 368 N.W.2d 571 (S.D.1985), *Jackson v. Jackson*, 281 Or. 575, 576 P.2d 12 (1978), and *Goodyear v. Goodyear*, 441 N.E.2d 498 (Ind.App.1982).

**{¶ 76}** *Office* also discussed an IRS ruling which had held that where a net operating loss of an unmarried taxpayer is carried over to a prior year, each spouse has an interest in the overpayment. *Office* at *15, citing Rev. Rul. 86-57 (Apr. 21, 1986). The ruling was based, in part, on a prior ruling which held that " 'when a husband and wife file a joint return each spouse has a separate interest in the jointly reported income and a separate interest in any overpayment * * *.' " *Id.*, quoting Rev. Rul. 86-57, *2. (Other citation omitted.)

**{¶ 77}** In this regard, we noted that:

The Internal Revenue Service determined that because Rev. Rul. 80-8 recognizes that each spouse has an interest in an overpayment and because Rev. Rul. 80-7 - which outlines the formula for determining the amount of overpayment to be allocated to a taxpayer suffering a net operating loss - allocates a share of the overpayment to the taxpayer's ex-spouse, the ex-spouse is also entitled to a refund. The taxpayer's ex-spouse is not entitled to a portion of his or her ex-spouse's refund. Rather, the ex-spouse may be entitled to a refund in his or her own right because the recomputation of the taxpayer's liability alters his or her own tax liability for that year.

*Office*, 2d Dist. Montgomery No. 15298, 1997 WL 18043, at *15.

{¶ 78} Based on the court decisions and the IRS ruling, we concluded in *Office* that the husband's refunds from the operating losses were separate property. However, we also noted that the ex-spouse might be entitled to a refund in her own right. *Id.*

{¶ 79} The IRS ruling referenced in *Office*, as well as our decision in *Office,* itself, provide support for the trial court's decision. Specifically, *Office* indicates that when joint returns are filed, " 'each spouse has a separate interest in the jointly reported income and a separate interest in any overpayment.' " *Office* at *15. Consequently, Vicki had an interest in the refund that resulted from an overpayment of taxes. Under the IRS ruling, Vicki would have been entitled to assert her interest in the refund. However, Vicki had no ability to file for a separate refund, because William had already caused the parties to file a joint return. In contrast, the husband in *Office* filed a separate return based on new information and received an additional refund after a joint return had been filed.

{¶ 80} Furthermore, unlike the parties in *Office* and the cases cited in *Office*, William and Vicki were *still married* when the return in question was filed. This was not a situation in which William sustained a net operating loss after the date of the divorce and filed a separate return to generate a refund for prior years when he was married.

{¶ 81} William also relies on *Millstein v. Millstein*, 8th Dist. Cuyahoga Nos. 79617, 79754, 80184, 80185, 80186, 80187, 80188, 80963, 2002-Ohio-4783, in which the court rejected a wife's claim for one-half of a joint tax refund because the husband paid the couple's taxes during marriage, including the overpayment of taxes. However, the court's decision was based on the parties' prenuptial agreement, which provided that "property acquired by each from separate funds shall be their separate property." *Id.* at ¶ 106. There was no such agreement in the case before us.

**{¶ 82}** As an additional matter, we note that William did raise the issue of the 2011 tax return in his prior appeal. There, he asserted error based on the trial court's retention of jurisdiction over the 2011 tax return, because "no issue related to that return was before the court at the [divorce] hearing." *Dorsey*, 2d Dist. Montgomery No. 25436, 2013-Ohio-4237, at ¶ 35. In responding, we commented that:

In June 2012, Ms. Dorsey filed a motion that the trial court divide the 2011 tax refunds, which she believed Dr. Dorsey had "somehow, converted * * * to his personal use," notwithstanding that the refund checks should have been payable to both parties. According to Ms. Dorsey, the parties were entitled to a $23,097 refund from their federal tax return and a $39,928 refund from their state return in 2011. She claimed that she was entitled to half of this amount, or $31,512.50.

Dr. Dorsey emphasizes that the de facto end of the marriage was in 2010, that the 2011 tax return/refund was not addressed at the [divorce] hearing, and that neither party "consented in writing" to the court's retention of jurisdiction over this issue. These arguments are unpersuasive, as the hearing occurred in 2011, before any tax return for that year could possibly have been filed, and the decree of divorce was not filed until October 2012, even if the parties agreed to use an earlier date as the end of the marriage for purposes of division of property. Thus, the parties were married, under the law, throughout 2011, and Ms. Dorsey asserts that they filed joint tax returns for that year.

The trial court did not abuse its discretion in treating the 2011 tax

refunds as marital assets and in assuming that the parties would not agree on the distribution of those assets without the court's involvement. Thus, the court did not abuse its discretion in retaining jurisdiction over this issue.

*Id.* at ¶ 37-39.

**{¶ 83}** Our prior observations were correct. The hearing at which the parties agreed to a de facto valuation date occurred prior to the time that the 2011 income taxes were filed. William chose to file jointly to gain the benefit of additional refunds. He was only able to do so and to obtain this benefit because the parties were still married. Since William chose this course, the trial court did not act unreasonably in deciding that, equitably, Vicki should receive half of the refund.

**{¶ 84}** A "domestic relations court may use alternate valuation dates to achieve the equitable distribution of marital assets." *Berger v. Berger*, 1st Dist. Hamilton No. C-030631, 2004-Ohio-5614, ¶ 12, citing R.C. 3105.171(A)(2) and 3105.171(C). (Other citation omitted.) In *Berger*, the court found no abuse of discretion in the use of alternative valuation dates because of the extended course of the litigation. *Id.* (stressing that "[t]he court has broad discretion in determining these dates, and its decision will not be reversed absent an abuse of that discretion"). *See also Heyman v. Heyman*, 10th Dist. Franklin No. 05AP-475, 2006-Ohio-1345, ¶ 32 ("a trial court is permitted to determine and apply different valuation dates, such as the time of permanent separation or the de facto termination of the marriage. Moreover, a court's determination as to when to apply a de facto termination date falls well within the broad discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion.") (Citation omitted.)

**{¶ 85}** Based on the preceding discussion, the First Assignment of Error is

sustained in part and overruled in part. The judgment of the trial court as to the amount required to equalize the property will be modified on remand to provide that the total amount owed to Vicki as of September 24, 2015, was $275,804.50 (prior to calculation of any interest), rather than the $287,304 the trial court previously found due.

### III.   Interest rate on the Property Division Award

**{¶ 86}** Because the Second Assignment of Error and the Cross Assignment of Error are related, we will consider them together.   William's Second Assignment of Error states that:

> The Trial Court Erred in Awarding Interest at The Rate of 5% on the
>
> Property Division Award.

**{¶ 87}** Vicki's Cross-Assignment of Error states as follows:

> The Trial Court Abused Its Discretion in Commencing the Accrual of
>
> the Interest on the Unpaid Property Division Amount as of November 25,
>
> 2015 Instead of November 15, 2012.[13]

**{¶ 88}** Concerning the interest rate, William's position is that the trial court erred in applying an interest rate of five percent on the property division award.   William notes that Vicki originally requested only three percent interest in the motion for interest that she filed in May 2014, and did not present any evidence to support her later suggestion in a post-hearing brief that the rate should be five percent.   Vicki contends the interest rate was reasonable because it was the same amount the parties used for the interest to

---

[13] Although the original divorce decree was filed on October 15, 2012, it provided for payment of the property division one month later, in November 2012.

be paid on the cash surrender value of the life insurance policy.

{¶ 89} Again, we review the trial court's decision for abuse of discretion. *James*, 101 Ohio App.3d at 680, 656 N.E.2d 399. In view of this deferential standard, we cannot find that the amount of interest was an abuse of discretion.

{¶ 90} Although Vicki originally asked for three percent interest, she did later contend that if she had been given the money, she could have invested it for at least the five percent interest rate that William's life insurance policy provided, and to which the parties had stipulated as the interest rate for the increase in the value of the policy during the litigation.

{¶ 91} William does not argue that this point is factually untrue; he simply contends that the court should have used the rate Vicki originally requested. The court's decision to choose between these rates was not unreasonable in view of the facts before it, and we cannot say it was an abuse of discretion. Accordingly, William's Second Assignment of Error is overruled.

{¶ 92} In support of the Cross-Assignment of Error, Vicki contends that the trial court's decision to award interest only from September 24, 2015, was arbitrary and unreasonable because it deprived her of the use and enjoyment of the money for three years, while William has been able to use the funds. Furthermore, in arguing that interest should have been awarded from the time of the original divorce decree, Vicki notes that the decree ordered William to pay her $228,000 by November 15, 2012, to equalize the division of the assets. She, therefore, contends that the "law of the case" is that she is entitled to interest because William did not raise the interest issue on appeal.

{¶ 93} In contrast, William argues that awarding interest is within the trial court's

discretion, and that the court correctly found it would have been improper to assess interest until the time that the money actually became due and payable, i.e., after the appeal process had concluded. William also states that he "does not take issue with the trial court's award of interest from September 24, 2015 forward because that is when the trial court modified the property division award based on remand instructions from this Court." Reply Brief of Appellant/Cross-Appellee, p. 7. In its decision, the trial court agreed with William that awarding interest would be improper until money was due and payable. The court stressed that William had exercised his right to appeal, and that the court of appeals had remanded the case for additional testimony on a number of issues.

{¶ 94} R.C. 1343.03(A) provides in pertinent part that:

[W]hen money becomes due and payable * * * upon all judgments, decrees, and orders of any judicial tribunal for the payment of money arising out * * * a contract or other transaction, the creditor is entitled to interest at the rate per annum determined pursuant to section 5703.47 of the Revised Code, unless a written contract provides a different rate of interest in relation to the money that becomes due and payable, in which case the creditor is entitled to interest at the rate provided in that contract.

{¶ 95} Courts have held that under R.C. 1343.03, "a party receiving a definite money judgment is entitled to interest at ten percent per year as a matter of law. * * * This right is equally applicable to obligations arising out of a divorce decree." *Rizzen v. Spaman*, 106 Ohio App.3d 95, 111, 665 N.E.2d 283 (6th Dist.1995), citing *Koegel v. Koegel*, 69 Ohio St.2d 355, 432 N.E.2d 206 (1982), syllabus. (Other citation omitted.)

{¶ 96} In *Koegel*, the Supreme Court of Ohio declined "to hold that a trial judge is

obligated as a matter of law to mandatorily affix interest to those monetary obligations which arise out of a property division upon divorce. To do so would impose an unnecessary restraint on a trial judge's flexibility to determine what is equitable in a special set of circumstances." *Id.* at 357. The court also declined to consider whether R.C. 1343.03(A) applies to cases involving the division of marital property, because this statute "is applicable only to obligations that are due and payable, and the obligation here will not become due and payable until the occurrence of a future event." *Id.*

**{¶ 97}** After *Koegel*, the Supreme Court of Ohio has not further addressed R.C. 1343.03(A) in the context of interest on property divisions in divorces. Lower courts have observed that "case law on the issue of interest on property divisions pursuant to a decree of divorce is somewhat unsettled." *Meeks v. Meeks*, 10th Dist. Franklin No. 05AP-315, 2006-Ohio-642, ¶ 18. We have made the same observation. *See McKay v. McKay*, 2d Dist. Montgomery No. 23702, 2010-Ohio-3348, ¶ 35.

**{¶ 98}** We need not resolve any disputes in the caselaw to resolve the current matter. Specifically, even though Vicki contends that William is precluded by the law of the case from challenging her right to interest at the time of the original judgment, she is actually the one who is precluded from asserting such a right.

**{¶ 99}** Our decision is based on the fact that the trial court did not include interest in the original divorce decree, which was a final order from which an appeal was taken. As a result, Vicki should have raised the issue of interest in the prior appeal if she felt she was entitled to interest on the matters covered by the judgment. *Compare Chepp v. Chepp*, 2d Dist. Clark No. 2010-CA-113, 2011-Ohio-4451, ¶ 15 (refusing, on res judicata grounds, to consider an issue in divorce case that could have been raised in prior appeal).

Contrary to Vicki's assertion, William was not responsible for raising the issue, as the trial court did not order him to pay interest on any items in the divorce judgment.

{¶ 100} " 'The doctrine of res judicata encompasses the two related concepts of claim preclusion, also known as * * * estoppel by judgment, and issue preclusion, also known as collateral estoppel.' " *Chepp* at ¶ 16, quoting *Grava v. Parkman Twp.*, 73 Ohio St.3d 379, 381, 653 N.E.2d 226 (1995). " 'Under the doctrine of res judicata, "[a] valid, final judgment rendered upon the merits bars all subsequent actions based upon any claim arising out of the transaction or occurrence that was the subject matter of the previous action." ' " *Id.*, quoting *Kelm v. Kelm*, 92 Ohio St.3d 223, 227, 749 N.E.2d 299 (2001). (Other citation omitted.) In addition, " '[r]es judicata operates to bar litigation of "all claims which were or might have been litigated in a first lawsuit." ' " *Chepp* at ¶ 16, quoting *Grava* at 382. (Other citation omitted.)

{¶ 101} The only issue before us, then, is whether the trial court abused its discretion in awarding interest from September 24, 2015, i.e., the date of the court's first amendment to the divorce decree. Because William agrees that interest from that date is appropriate, there is no basis upon which we could find that the trial court erred or abused its discretion. Accordingly, Vicki's Cross-Assignment of Error is overruled.

## IV. Conclusion

{¶ 102} William's First Assignment of Error is overruled in part and is sustained in part; William's Second Assignment of Error and Vicki's Cross-Assignment of Error are also overruled. The judgment of the trial court is reversed in part, and is remanded to the trial court. On remand, the trial court shall modify the judgment to provide that the

total amount owed on September 24, 2015, to equalize the property division, after crediting William with a payment of $154,763, is $275,804.50.   In all other respects, the judgment of the trial court is affirmed.



. . . . . . . . . . . . .



HALL, P.J. and FROELICH, J., concur.


Copies mailed to:

Charles D. Lowe
John D. Smith
Andrew P. Meier
Hon. Timothy D. Wood